Jan LIBRONT, et al., Plaintiffs,

v.

COLUMBUS McKINNON
CORP., Defendant.

No. 83–CV–858S.

United States District Court,
W.D. New York.

March 12, 1993.

Willard M. Pottle, Jr., Buffalo, NY, for plaintiffs.

## DECISION AND ORDER [1]

SKRETNY, District Judge.

### INTRODUCTION

Presently before this Court are the following motions of defendant Columbus McKinnon Corporation: (1) defendant's motion to preclude the testimony of plaintiffs' expert witness, Dr. Ronald Reiber; and (2) defendant's motion pursuant to Fed.R.Civ.P. 50(a) for judgment as a matter of law in its favor on the issues of (a) the voluntariness, coerciveness or subterfugal nature of the early retirement and enhanced early severance packages, (b) plaintiffs' disparate impact claim, (c) the individual claims of plaintiffs Riggie, Andrews, Kennedy, Salefske, and Wik, (d) plaintiffs' pattern or practice claim,

and (e) the individual claims of the remaining twenty-three plaintiffs.

Plaintiffs have filed a complaint seeking damages, alleging that they were terminated from defendant corporation on the basis of their age, in willful violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. This Court has federal question jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331. The present motions were made during trial, at the close of plaintiff's direct case.

Plaintiffs allege that defendant unlawfully terminated their employment during the period of July 1, 1982 to August 3, 1983. Plaintiffs allege that they were terminated by various means: (1) an early retirement plan offered in July 1982; (2) an early retirement plan offered in April 1983; (3) an enhanced

---

1. This Decision and Order has been adapted for publication. It combines Decisions of this Court entered on March 2, 1993 and March 12, 1993.

severance package offered in January 1983;[2] (4) an involuntary reduction in force in July 1982; and (5) an involuntary reduction in force in January 1983. Plaintiffs, who were all age 40 or older at the time of their terminations, contend that they were singled out for termination on the basis of their age, and that defendant willfully violated the ADEA. Although plaintiffs recognize that during the relevant period the ADEA specifically exempted employee benefit plans (e.g., early retirement and enhanced severance packages) from its coverage, they claim that those who opted for such packages did so involuntarily and were coerced by threats of layoff.

Plaintiffs rely on three theories of liability. First, they allege that defendant's activities, when considered together, had a disparate impact on workers over the age of 40. In other words, they claim that a disproportionately large number of older workers were terminated, compared to younger workers. Second, plaintiffs contend that defendant engaged in a pattern or practice of intentional age discrimination. They argue that this entitles each individual plaintiff to a presumption that his or her termination was precipitated by unlawful motives. Finally, each plaintiff asserts an individualized claim of age discrimination. Each plaintiff claims that he or she has raised an inference that his or her termination was motivated by age, requiring defendant to articulate a lawful and legitimate reason for the termination.

On the other hand, defendant maintains that plaintiffs' ages were not improperly considered in connection with its employment decisions. It contends that these decisions were motivated solely by severe economic conditions, and the need to reduce operating costs. Defendant argues that, in fact, a disproportionately *low* number of older workers were terminated through layoffs, and that plaintiffs were in no way coerced into accepting early retirement or enhanced severance packages. Defendant insists that although certain plaintiffs may have been advised that they could ultimately be laid off if they re-fused such a package, these plaintiffs were put in no worse a situation than younger workers. Furthermore, defendant argues that it never used the possibility of layoff as an ultimatum to coerce a plaintiff into accepting any of these packages.

Trial commenced on January 4, 1993, and each plaintiff testified, with the exceptions of plaintiffs Carere and Kreutzer, who passed away prior to trial. Furthermore, a number of defendant's corporate executives were called and testified as plaintiffs' witnesses. Near the end of plaintiffs' case, plaintiffs' counsel indicated that plaintiffs' final witness would be Dr. Ronald Reiber. Dr. Reiber's testimony would be based on statistics he prepared indicating that, when the layoffs, early retirements, and enhanced early severances were considered together, a disproportionately large number of older workers were terminated by defendant. Plaintiffs intended to use this testimony to prove their disparate impact claim of age discrimination. At that point, defendant made the present motion to preclude the testimony of Dr. Reiber, arguing that his statistics were not relevant because they included the early retirement and enhanced early severance packages, which were sanctioned by the ADEA during the relevant period. Similarly, defendant moved for judgment as a matter of law on the issue of whether plaintiffs Riggie, Andrews, Kennedy, Salefske, and Wik were coerced into accepting early retirement or enhanced early severance, pursuant to Fed.R.Civ.P. 50(a). On the same basis, defendant moved for judgment as a matter of law on plaintiffs' pattern or practice claim, and on the individual claims of those five plaintiffs. Extensive oral argument on these motions was heard on February 19, 1993, which included an offer of proof regarding the admissibility of Dr. Reiber's testimony.

Plaintiffs formally rested on February 24, 1993. Defendant immediately moved for judgment as a matter of law on plaintiffs' disparate impact claim, as well as the individual claims of the twenty-three remaining plaintiffs. Extensive oral argument on these

---

**2.** Five members of the plaintiff class who chose the early retirement or enhanced severance options now allege that they were coerced to accept these options (plaintiffs Riggie, Andrews, Kennedy, Salefske, and Wik).

motions was heard on February 26 and March 1, 1983.

After reviewing all the evidence presented at trial, this Court holds that the testimony of Dr. Reiber is not relevant under Fed. R.Evid. 402 because plaintiffs have failed to raise an inference that the early retirement or enhanced early severance packages were subterfuges to evade the purposes of the ADEA, that the plaintiffs were constructively discharged, or that the packages were involuntary or coercive. Therefore, defendant's motion to preclude Dr. Reiber's testimony will be granted. For the same reason, defendant's motion for judgment as a matter of law on plaintiffs' disparate impact claim will be granted. Defendant's motion for judgment as a matter of law on the claims of Riggie, Andrews, Kennedy, Salefske, and Wik will be granted. Finally, defendant's motion for judgment as a matter of law on plaintiffs' pattern or practice claim, and on the individual claims of each of the remaining twenty-three plaintiffs will be granted.

### FACTS[3]

Defendant Columbus McKinnon Corp. is a New York corporation with its headquarters in Amherst, New York. During the period relevant to this lawsuit, defendant was engaged in the manufacture of hoists, chains, and forgings. Its facilities included plants located in Tonawanda, New York; Abingdon, Virginia; Damascus, Virginia; and Manatee, Florida. During the relevant period, plaintiffs were employed at corporate headquarters or at one of these facilities.

During the early 1980's defendant experienced a significant economic decline. Its financial reports indicate that its net domestic income declined over 70% during the fiscal years ending in March 1980 and March 1982 (exh. 741a). Defendant's net sales decreased by $33.3 million over the next fiscal year (exh. 741b), and defendant suffered a record loss of $4.7 million (exh. 741a). In response to these conditions, defendant adopted a number of cost saving measures, including a reduction in capital expenditures, salary reductions for all executive personnel, the closure of sales offices, and hiring freezes.

Defendant also undertook the measures that are the subject of plaintiffs' claims. On June 15, 1982, defendant's corporate president, H.P. Ladds, Jr., circulated a memorandum to supervisory personnel requesting that the supervisors advise him of employees in their departments who were the "least productive," or with whom the supervisors were dissatisfied due to poor performance (exh. 99–C). The memorandum instructed the supervisors that they were to base their selections on "strictly performance," and that the selections were necessary "to identify and weed out marginal performers and surplus or superfluous positions." There is no reference to age in any of the instructions provided to the supervisors. As a result of the selections made by the supervisors, 46 employees were permanently laid off in July 1982, including plaintiffs Libront,[4] Barnes, Quesnell, Clark, Cornwell, Long, Carere, Hodkin, Grimes, Widener, Thomas, and Farris. In November 1982 plaintiff Luke was laid off as well.

In July 1982 defendant further reduced its workforce by offering qualified employees a voluntary early retirement package. To be eligible for such a package, the employee must have had ten years of experience with defendant, and must have reached age 60 by the end of 1982. The package provided a monthly pension benefit that would not be actuarially reduced, despite the fact that the employee retired before age 65; a supplemental benefit equal to 25% of the employee's salary, not to exceed $650.00 per month, until the employee reached age 65; and continued life and health insurance. 45 of the 57 eligible employees who were offered this early retirement option accepted the package. One of those who accepted was plaintiff Riggie.

---

**3.** The facts contained in this section are based upon the evidence admitted at trial.

**4.** Although Libront was selected for permanent layoff, he was given the option to accept an enhanced early retirement package that was being provided to other employees. Libront chose this option, and executed an acceptance form effective August 31, 1982.

Defendant's financial decline continued, and in January 1983 it undertook to reduce its workforce further through an enhanced voluntary severance package. The benefits paid under that package included the same supplemental monthly benefit available under the July 1982 early retirement package. The benefits also included health and life insurance coverage. Four of the five employees who were offered this enhanced voluntary severance option accepted the package, including plaintiffs Salefske and Wik.

In April 1983 defendant offered a second enhanced early retirement package to eligible employees. The benefits under this package were identical to those available under the July 1982 early retirement package. However, to be eligible for the April 1983 package the employee must have had ten years of experience with defendant, and must have reached age 58 by the end of 1982. Twenty-three of the thirty-one employees who were offered this second early retirement option accepted the package, including plaintiffs Andrews and Kennedy.

Defendant's financial condition did not improve, and during the first few months of 1983 additional employees were laid off, including plaintiffs Dorko, Mikos, Nowark, Kreutzer, Habicht, Koval, Suits, Taylor, and Larkey.

Plaintiff Rook was discharged from defendant's employ in August 1982, allegedly for repeatedly violating defendant's attendance policy. Rook had previously been cited for lateness and unexcused absence. On August 20, 1981 Rook received a warning for frequent lateness (exh. 748). On November 4 and December 16, 1981 Rook received reprimands for poor attendance (exhs. 749, 750). Rook was suspended for one day on July 13, 1982 (exh. 751), and for three days on March 23, 1982 (exh. 752).

Overall, defendant's workforce was reduced by 31.6% during the period relevant to this lawsuit. During the relevant period, defendant involuntarily laid off 147 out of 789 non-union employees who were employed as of July 1, 1982. Sixty-three of those laid off (43%) were age 40 or over as of that date. It is important to note that no employee who rejected an early retirement or enhanced early severance package was subsequently laid off by defendant.

Plaintiffs Libront, Barnes, and Quesnell filed this action on August 3, 1983, alleging that defendant terminated their employment because of their age. On November 30, 1984 the Hon. John T. Elfvin, United States District Judge for the Western District of New York, authorized plaintiffs to send notice of the action to defendant's former employees who were terminated during the relevant period and who were age 40 or over at the time of their terminations. Such a notice was sent to approximately 130 former employees, 27 of whom filed consents to "opt-in" to this action, pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b). On August 13, 1985 Judge Elfvin granted plaintiffs leave to file an amended complaint. Plaintiffs filed an Amended Complaint, adding the 27 additional plaintiffs. On August 23, 1985 defendant moved to dismiss the Amended Complaint. Defendant's motion was granted, but plaintiffs were allowed to file a Second Amended Complaint. Plaintiffs filed a Second Amended Complaint naming the original three plaintiffs, plus 26 of the "opt-in" plaintiffs. On November 21, 1986 defendant moved to dismiss plaintiffs' Second Amended Complaint on a number of grounds. On July 13, 1987 Judge Elfvin granted defendant's motion to dismiss in part, and denied it in part. Among the rulings made by Judge Elfvin was that, although the claims of one of the remaining 26 "opt-in" plaintiffs had to be dismissed from the case, the remaining "opt-in" plaintiffs were "similarly situated" to the original three plaintiffs, and all of plaintiffs' claims could therefore be litigated together. Furthermore, Judge Elfvin held that any "opt-in" plaintiff who filed his or her notice to intervene in this lawsuit between two and three years after they received notice of their termination would be constrained to proving a willful violation of the ADEA, pursuant to Section 7(e) of the ADEA, 29 U.S.C. § 626(e)(1), which incorporates the statute of limitations provisions in Section 6(a) of the Portal-to-Portal Act, 29 U.S.C. § 255(a).

Shortly before trial, defendant made motions in limine seeking to preclude plaintiffs

from introducing evidence regarding their disparate impact theory of age discrimination, and from introducing certain statistical evidence prepared by Dr. Reiber in support of plaintiffs' disparate impact theory. By a Decision and Order of this Court entered on November 23, 1992,[5] this Court did not expressly preclude plaintiffs from introducing any evidence in support of their disparate impact theory of age discrimination; however, the Decision established certain parameters for admissibility of any expert testimony offered in support of plaintiffs' disparate impact theory of age discrimination.

Trial commenced on January 4, 1993. Defendant made the present motions at the conclusion of plaintiff's proof.

## DISCUSSION

### DEFENDANT'S OBJECTIONS TO DR. REIBER'S TESTIMONY

Defendant's objection to the testimony of Dr. Reiber requires this Court to reiterate many of the principles set forth in its Decision and Order entered on November 23, 1992. That Decision and Order established the parameters for admissibility of any expert testimony to support plaintiffs' disparate impact theory of age discrimination.

Plaintiffs have proffered Dr. Reiber's testimony as evidence of the effect of defendant's alleged Cost Savings Plan on employees over the age of forty. Plaintiffs have made an offer of proof to demonstrate the statistical relevance of Dr. Reiber's testimony. This offer of proof has shown that Dr. Reiber would testify that, when the number of employees terminated under the early retirement and enhanced severance packages are included in the sample, the statistics show a standard deviation of 14. This measure would show that defendant's Cost Savings Plan had a disparate impact on employees age 40 or over. Nonetheless, Dr. Reiber's statistics would not address each of the ele-

ments of the Cost Savings Plan individually. Rather, the statistics would be premised upon all the elements as a group. In fact, Dr. Reiber has previously indicated that, when the early retirement and enhanced severance packages are eliminated from the sample, no standard deviation exists that would indicate a violation of the ADEA.[6] Furthermore, the statistics would make no distinction between packages offered at different time periods, by different corporate branches, to different groups of employees

■ Statistical evidence may be highly relevant to a disparate impact claim. The Supreme Court has held that statistical proof alone may be sufficient to make out a prima facie case for disparate impact. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Nevertheless, under Fed.R.Evid. 402 "[f]or statistics to be valid and helpful in a discrimination case; 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987), *quoting Segar v. Smith*, 738 F.2d 1249, 1274 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). In other words, the statistics upon which plaintiffs rely must refer to a proper sample of employees, and must not take impermissible factors into account.

■ For example, in its earlier Decision and Order this Court explained that "plaintiffs ... will not be allowed to lump all of the components of the Plan together and rely on the combined statistical analysis showing that the Plan had a net result of disparate impact. Plaintiffs will be required to make out a prima facie case by showing that each component had a disparate impact on older workers." The clear import of that holding was that plaintiffs and their expert witness would be required separately to analyze the

---

**5.** That Decision and Order is reproduced at 1992 WL 373649 (W.D.N.Y.1992); 1992 U.S.Dist. LEXIS 19029 (W.D.N.Y.1992).

**6.** See also the calculations contained in Court exhibit 25, to which the parties have stipulated. This exhibit shows that on July 1, 1982 defendant

employed 789 salaried and non-union factory and office employees. Of those employees, 54.2% were age 40 or over. Between July 1, 1982 and August 2, 1983, 101 of those employees were laid off and not rehired. Of those laid off, 45.5% were age 40 or older.

layoffs, early retirement packages, and enhanced early severance package, to determine whether they each had a disparate impact on employees over the age of forty. See *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 975, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988); *Lowe v. Commack Union Free School Dist.,* 886 F.2d 1364, 1371 (2d Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). The need for this type of separate analysis is especially pronounced because the early retirement and enhanced severance packages are presumed to be lawful under the ADEA.

■ From plaintiffs' offer of proof, it is evident that Dr. Reiber intends precisely to lump the components of the Plan together to obtain a result of disparate impact. From the evidence introduced at trial, it is all the more clear that this strategy would be inappropriate. The evidence has shown that the Cost Savings Plan is not subject to attack as a "specific employment practice" that violates the ADEA. *Watson,* 487 U.S. at 994, 108 S.Ct. at 2789. Defendant implemented a number of different packages, including voluntary early retirement and voluntary enhanced early severance, which are presumed to be lawful under the ADEA. 29 U.S.C. § 623(f)(2) (1985). The evidence also has shown that the components of the Plan were introduced at different times and involved different pools of employees. These factors demonstrate the importance of challenging the components on an individual basis. Because Dr. Reiber's statistical evidence does not do this, it is not relevant to the issue of disparate impact and must be precluded.

■ As mentioned above, the early retirement and enhanced severance packages are presumed to be lawful under the ADEA. As explained fully in this Court's previous Decision and Order, "The ADEA specifically exempts voluntary retirement packages and other employee benefit plans from the list of prohibited employment practices." *Henn v. National Geographic Society,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). 29 U.S.C.

§ 623(f)(2) (1985) states that it is not unlawful for an employer "to observe the terms . . . of any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter." By "bona fide", the statute means that the plan exists and pays benefits. *Public Employees Retirement. Sys. of Ohio v. Betts,* 492 U.S. 158, 166, 109 S.Ct. 2854, 2860, 106 L.Ed.2d 134 (1989). By "subterfuge", the statute refers to intentional discrimination against older workers. Therefore, I earlier held that "in order to challenge the voluntary retirement or enhanced voluntary severance components of the Plan in the present case, the plaintiffs will be required to prove that these components were subterfuges to evade the ADEA."[7] I also explained that plaintiffs could challenge the impact of the early retirement and enhanced severance packages if plaintiffs could prove that they were coerced into accepting the packages, or that the packages were involuntary. Plaintiffs could prove constructive discharge by showing, for example, that they had too little time to consider the packages before deciding. This is consistent with the language of the ADEA, indicating that no employee benefit plan may "require or permit the involuntary retirement of any individual . . . because of the age of such individual." 29 U.S.C. § 623(f)(2) (1985).

■ After fully reviewing all the evidence that has been presented during plaintiffs' case in chief, this Court finds that plaintiffs have failed to offer sufficient evidence from which it can be concluded that the retirement or enhanced severance packages were subterfuges to evade the ADEA, that the employees who accepted those packages were coerced into doing so, or that the employees were constructively discharged. Therefore, even if the alleged Cost Savings Plan *as a whole* could be considered as the "specific employment practice" at issue, § 623(f)(2) requires that these packages could not be considered together with the layoffs to reach a finding of disparate impact. The rationale

---

**7.** The burdens of proof described in *Betts* were later changed by legislation that was expressly non-retroactive. Older Workers Benefit Protection Act, Pub.L. 101–433, 104 Stat. 978–83 (1990). This statute has no effect on the burdens of proof that apply in the present case.

for these findings will be more fully discussed below. Consequently, Dr. Reiber's testimony is not relevant and must not be admitted at trial.

In the *Simpson* case previously cited, the plaintiff proffered statistical evidence demonstrating the average age of employees hired and fired during the relevant period. The Sixth Circuit held that plaintiff's evidence was not relevant to show intentional age discrimination because it included within the "terminated" class certain employees who "might have retired early under an incentive plan or might have accepted jobs elsewhere." *Id.* at 943. See also *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981), in which the Second Circuit looked to the effect of the challenged practice only on the group specifically protected by the ADEA. Here, because Dr. Reiber would include in his statistical analysis those employees who were terminated pursuant to the early retirement or enhanced severance packages, and because plaintiffs have failed to offer sufficient evidence from which it can be concluded that these packages were unlawful, Dr. Reiber's statistics are not probative, and his testimony will be precluded under Fed.R.Evid. 402. See also *Palmer v. Reader's Digest Assoc.,* 1992 WL 73468 (S.D.N.Y.1992).

## DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW

To resolve defendant's motions for judgment as a matter of law, this Court has undertaken a thorough review of the testimony of each of the individual plaintiffs, as well as the testimony of a number of defendant's employees. During oral argument, counsel diverged somewhat in their recollection of these witnesses' testimony. This testimony is critical in determining whether a reasonable jury could conclude that the early retirement and enhanced early severance packages were subterfuges to evade the purposes of the ADEA, were involuntary, or were coercive. If the evidence presented would not support such a conclusion, then these packages must be considered lawful under 29 U.S.C. § 623(f)(2). Therefore, evidence regarding these packages would not be relevant in determining whether defendant's alleged Cost Savings Plan had a disparate impact on workers in the protected age group. If this evidence were not relevant, statistics regarding these packages would not be admissible. Finally, the individuals whose employment ended pursuant to these packages would have no cause of action under the ADEA.

Furthermore, this testimony is critical in determining whether a reasonable jury could conclude that defendant engaged in a pattern or practice of intentional age discrimination, and whether each individual plaintiff has raised an inference that age was a motivating factor in their termination.

Pursuant to Fed.R.Civ.P. 50(a), judgment as a matter of law is available where "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.... Motions for judgment as a matter of law may be made at any time before submission of the case to the jury." In other words, judgment as a matter of law is appropriate where "either party is unable to carry a burden of proof that is essential to that party's case." Notes of Advisory Committee on Rules. When considering a motion under Rule 50(a), "the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence." 9 Wright & Miller, Federal Practice and Procedure: Civil § 2524.

### Judgment as a Matter of Law on Disparate Impact Claim

Defendant has moved for judgment as a matter of law on plaintiffs' disparate impact claim. Defendant argues that plaintiffs have failed properly to demonstrate that defendant's employment practices had a disparate impact on employees over the age of 40. Defendant indicates that, when the number of employees terminated under the early retirement and enhanced severance packages is eliminated, there is no statistical showing of a disparate impact.

Plaintiffs have introduced all relevant testimony and other evidence relating to their disparate impact claim. To prevail on this claim, plaintiffs were required to show that the early retirement and enhanced early severance packages were involuntary, coercive, or were otherwise subterfuges to evade the purposes of the ADEA. Here, after viewing all the evidence adduced by plaintiffs in a light most favorable to them, this Court has determined that plaintiffs have failed to introduce sufficient evidence with regard to this issue, and judgment must be awarded as a matter of law to defendant on plaintiffs' disparate impact claim.

■ In its previous Decision and Order, this Court explained to plaintiffs that the ADEA specifically exempts voluntary retirement packages and other employee benefit plans from the list of prohibited employment practices. *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.), *cert. denied*, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). 29 U.S.C. § 623(f)(2) states that it is not unlawful for an employer "to observe the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter." By "bona fide," the statute means that the plan exists and pays benefits. *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 166, 109 S.Ct. 2854, 2860, 106 L.Ed.2d 134 (1989). By "subterfuge," the statute refers to intentional discrimination against older workers. *United Air Lines v. McMann*, 434 U.S. 192, 203, 98 S.Ct. 444, 450, 54 L.Ed.2d 402 (1977) (subterfuge means a "scheme, plan, stratagem, or artifice of evasion"). Therefore, in challenging an early retirement or enhanced severance package as a subterfuge, "the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some nonfringe-benefit aspect of the employment relation." *Betts*, 492 U.S. at 181, 109 S.Ct. at 2868. This represents a significant difference from typical disparate impact cases, in which the plaintiff is not required to establish intentional discrimination as part of his prima facie case. See *E.E.O.C. v. Chrysler Corp.*, 729

F.Supp. 1002, 1008 (S.D.N.Y.1990) (the term "subterfuge" connotes a subjective element).

■ Therefore, in order to challenge the voluntary retirement or enhanced voluntary severance components of the Plan in the present case, the plaintiffs were required to prove that these components were not bona fide, or that they were subterfuges to evade the ADEA. See *Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161 (7th Cir.1992) (discussing voluntary retirement plans under the ADEA).

Here, plaintiffs have failed to do either. The benefit packages provided to each of the five individuals certainly existed and paid benefits. Although the ADEA imposes the additional requirement that the benefits be substantial, the evidence shows that the benefits provided to the five plaintiffs were substantial.

The evidence showed that the value of plaintiff Riggie's benefits under the first early retirement package was $13,762.24, in addition to health and life insurance benefits. Although plaintiff Andrews testified that she was displeased that the benefits offered under the second early retirement package were less than the amount she had been earning, the value of the benefits she received was $49,926.00. The value of plaintiff Kennedy's benefits under the second early retirement package was $47,528.00. The value of plaintiff Salefske's benefits under the voluntary enhanced severance package was $62,637.00. In fact, Salefske testified that the amount of these benefits, when added to his Social Security benefits, were more than his earnings while working for defendant. Plaintiff Wik first accepted the enhanced severance plan, and was then offered the benefits provided by the second early retirement package. The value of Wik's benefits under the voluntary early severance and second early retirement packages was $80,055.00. Wik testified that he wrote to Stone saying that he would have been happy to have received the benefits provided by the first early retirement package. However, Wik did not qualify for the first early retirement package because he was too young; he was not eligible for the second early retirement package because he had already left defendant's em-

ploy under the early severance package. Nevertheless, defendant provided Wik the benefits available under the second early retirement package.

Finally, evidence was produced that the total value to the recipients of the first early retirement package was $1,792,239.00, and the total value to the recipients of the second early retirement package was $1,342,093.00.

■ Although the benefits provided to each plaintiff may not equal the amounts of each plaintiffs' previous earnings while working, they are more than sufficient to meet the substantiality requirement under the ADEA. See, e.g., *McMann*, 434 U.S. at 207, 98 S.Ct. at 452 (plan is bona fide "as long as the benefits ... are not so unreasonably small as to make the 'retirements' nothing short of discharges.") (White, J., concurring). The amounts offered to plaintiffs were considerably more than they would have received if they would have been laid off, and this Court finds that they were "substantial" for the purposes of § 623(f)(2). Plaintiffs offered no support for their contention that in order for benefits to be "substantial" they must be correlated to salary and pension increases to which the plaintiffs may have been entitled if they would have remained employed. Finally, the evidence does not support plaintiffs' allegations that the amounts paid under the challenged packages included pension payments to which the plaintiffs were already entitled. Therefore, plaintiffs have failed to raise an inference that the challenged packages were not bona fide. Consequently, these packages cannot be considered in the aggregate, and there is no showing of disparate impact.

It is clear that plaintiffs have failed to raise an inference that the packages were subterfuges to evade the purposes of the ADEA. In fact, defendant's evidence that each package was offered in direct response to troubled economic conditions during the period in question is not disputed. The corporation's net income dropped from $1.4 million in 1982 to $4.7 million in 1983; export sales decreased from $17.2 million in 1982 to $8.1 million in 1983; and overall sales plummeted from $104.7 million in 1982 to $71.3 million in 1983.

Moreover, plaintiffs have failed to offer direct or circumstantial evidence that any of the packages was actually intended to be a "scheme, plan, stratagem, or artifice of evasion." *McMann* at 203, 98 S.Ct. at 450. Although each of the five plaintiffs have testified that he or she felt coerced into accepting the package, or that he or she believed the package was involuntary, these bare allegations are not reinforced by plaintiffs' own testimony, or any of the other evidence produced at trial. In fact, the allegations are directly at odds with the particular circumstances and events about which plaintiffs testified. In other respects, these circumstances and events fail as a matter of law to raise an inference of subterfuge.[8]

Plaintiff Riggie testified that he was told several times by corporate officers that they were pleased with his work. When offered the first early retirement package, Riggie contacted his supervisors to determine whether he should accept the package. Riggie was concerned that he could not get a guarantee that he would not be laid off if he refused the package. Riggie did not like the prospect of early retirement because he had hoped to work until age 65. He was nearly 64 when he was offered the package. Riggie was concerned about the benefits he was offered because he needed to pay for his son's college education. He was also concerned about a reduction in Social Security benefits. Due to the layoffs that were being implemented, Riggie did not believe that con-

---

8. Although at oral argument plaintiffs' counsel claimed that this Court had precluded plaintiffs from introducing the testimony of other witnesses on this issue, this a severe mischaracterization of this Court's ruling. On December 17, 1992 plaintiffs' counsel submitted a list of 35 additional proposed witnesses. Five of these individuals were dead, and most of the names had not previously been provided to defendant, as required by this Court's established pre-trial procedures and orders. During a telephone conference on the record, which took place on December 24, 1992, this Court ruled that, as trial was about to begin, plaintiffs would be allowed to call only those additional witnesses with regard to whom defendant had an affidavit. Obviously, plaintiff would not be allowed to call the one deceased witness, although defendant did have his affidavit. The reasons for this Court's ruling are fully set forth in the record of that telephone conference.

tinuing to work was reasonable. After consulting his wife and family, he concluded that continuing to work was not worth the grief and stress of fearing layoff, and he decided to accept early retirement. Riggie testified that the choice to retire was his own, and that it was voluntary, although he said there were unspecified "extraneous circumstances" involved. Riggie testified that no one indicated to him that he would be laid off if he refused early retirement. In fact, one of defendant's supervisory personnel, Mr. Leoeswick, told Riggie that he did not believe Riggie would be laid off if he refused. Riggie accepted early retirement because he thought it was better than the prospect of possible layoff with no benefits.

Plaintiff Andrews testified that she was concerned that the second early retirement package would result in a reduction of benefits. She requested part-time employment, but was refused. She testified that no one ever discussed age with her. She asked for a guarantee that she would not be laid off if she refused the package, but did not receive a guarantee. Mr. Sweeney told her that he was satisfied with her work and even hoped that she would continue working, but he could not predict the future and guarantee her a position if she refused the package. No one ever indicated to her that she would be terminated if she refused the package. Furthermore, she testified that she knew of no one who had been terminated after refusing to accept early retirement. Andrews took a copy of a letter from Sweeney's files. The letter indicated that Kenneth Heim was being offered a retirement option that differed from hers. She was displeased that she did not receive a "special deal" like the one offered to Heim. However, she accepted the offer essentially because she felt it was a guarantee.

Plaintiff Kennedy testified that she would have liked to work until age 62 or 65. She recalled no layoffs in her office. Kennedy wanted a reassurance from her supervisors that she would not be laid off if she refused the second early retirement package. She received no such guarantee. Company President Ladds told her that he was satisfied with her work, but was reluctant to speak further or provide any advice. She also testified that she was aware of a "special deal" offered to Heim. She discussed the package with her husband, her family, and fellow employees. She recalled that many employees age 40 or over remained with the company despite the layoffs. She testified that she accepted the package because her husband was disabled, and she wanted a guaranteed source of income.

Plaintiff Salefske testified that he had hoped to work until age 65. He had the impression that he would not have a job if he refused the offer of enhanced early severance, but he did not specify why. He was age 57 during the relevant period and was therefore not qualified for either of the early retirement packages. He admitted that he was not eligible for either of the voluntary early retirement packages because he was *too young.* He was concerned that he could not obtain a guarantee that he would not be laid off if he continued to work. In fact, Chrzanowski told him that even Chrzanowski was concerned about being laid off. Nevertheless, Salefske did not say that this pressured him into accepting voluntary enhanced early severance. Salefske chose enhanced early severance because his mother was 90 years old, and there was too much work to do for his wife.

Plaintiff Wik testified that he was never reprimanded for his job performance. Overall, he was treated well by the company, and was never treated unfairly on the basis of his age. He was not eligible for the first early retirement package because he was too young. Because he accepted the voluntary early severance package, he was not eligible for the second early retirement package offered in April 1983. Nevertheless, after Wik sent a letter to Stone indicating that he would have been happy to have retired early under the first early retirement package, the benefits under the second early retirement package were offered to him, and he accepted them. Wik testified that he asked Chrzanowski whether he would be laid off, and Chrzanowski said that he himself feared being laid off. Grant asked Wik whether he had heard of anyone being laid off. Nevertheless, Wik understood these comments not

as threats of termination, but as an indication that his supervisors simply would not give him a guarantee that he would not be laid off. Therefore, Wik said he was "up against a brick wall." Two of his six children were going to college, and he was supporting his wife. Therefore, the enhanced severance package provided him with a guaranteed source of income.

Also relevant to the issue of subterfuge was evidence produced throughout the trial that no one who refused any of the early retirement or enhanced severance packages was thereafter laid off.

After considering this testimony, together with all the other testimony adduced by plaintiffs at trial, this Court concludes that plaintiffs have failed to raise an inference that any of the early retirement or enhanced severance packages was a subterfuge to evade the purposes of the ADEA. Plaintiffs' testimony demonstrates that each plaintiff accepted the offer because each believed it was a guarantee, in contrast to the prospect of remaining in the pool of employees subject to layoff. Plaintiffs offered no evidence that any of the packages was a "scheme, plan, stratagem, or artifice of evasion." *McMann* at 203, 98 S.Ct. at 450. On the contrary, plaintiffs' evidence reveals that layoffs were not made on the basis of age, and that those employees age 40 or over who remained in the pool of employees were impacted less severely by the layoffs than younger workers. Indeed, the evidence shows that no employee who refused an offer of early retirement or enhanced severance was thereafter terminated. Any statements made by corporate officers that involved the possibility of layoffs were explained by the plaintiffs themselves not as threats, but as indications that the officers were not giving a guarantee against layoff. Plaintiff Riggie was even told by supervisory personnel that he was not likely to be laid off. As plaintiff Andrews indicated, the time was filled with stress and pressure due to poor business conditions; however, this, without more, is not sufficient to raise an inference of subterfuge.

▪ Furthermore, *Bodnar v. Synpol,* 843 F.2d 190 (5th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988) re-

solves the question of whether the "special deal" provided to Kenneth Heim may be understood as proof of subterfuge. Courts have found evidence of subterfuge where offers of early retirement were made to employees on a selective basis, and where certain employees were excluded from the plan. See, e.g., *Downey v. Southern Natural Gas Co.,* 649 F.2d 302 (5th Cir.1981). Nonetheless, *Bodnar* explains, "An employer may implement an early retirement plan that does not extend to all potential eligible employees if objective factors explain the exclusions." *Bodnar* 843 F.2d at 193. There, the court held that plaintiffs failed to refute or undermine defendant's explanation that exceptions were made for essential employees. The court wrote, "Surely an employer faced with the need to cut its workforce in order to survive ... may not be required to cut off its ability to survive as well in order to escape ADEA liability for an early retirement bonus program." *Id.* In the present case, defendant's officers have testified that Heim possessed unique qualifications and was a necessary employee. Heim was plant manager at the Tonawanda plant, and participated in a program to evaluate defendant's chain-making operations nationwide. Plaintiffs have failed to refute or undermine this evidence in any way. Therefore, the "special deal" provided to Heim does not give rise to an inference of subterfuge. In fact, plaintiffs' allegation is undermined by the fact that Heim was considerably older than many of the employees who chose early retirement or enhanced severance.

Finally, although plaintiffs' counsel argued that the first early retirement package was a subterfuge because it was offered immediately after layoffs, the proof adduced at trial does not support this argument. Significantly, plaintiff Riggie did not testify that he was coerced into accepting early retirement as a result.

Another way the five plaintiffs listed above would have been able to challenge the impact of the early retirement or enhanced severance components of the Plan would have been to produce evidence that these packages were in fact coercive or involuntary. Section 623 provides that such packages are

not exempted from the ADEA if they "require or permit the involuntary retirement of any individual ... because of the age of such individual." Plaintiffs' counsel claimed during oral argument that the five plaintiffs were not given enough time to make a reasonable decision whether to accept the offer of early retirement or enhanced severance. The Second Circuit has explained, "We believe it is relevant to the determination of voluntariness whether the employees received sufficient time to make a decision." *Paolillo v. Dresser Indus., Inc.*, 821 F.2d 81 (2d Cir.1987). In *Paolillo*, plaintiffs stated in deposition testimony that they felt "pressured by the haste in which the plan was implemented and the lack of time they were given to come to a decision." *Id.* at 84. After learning of the details of the plan in *Paolillo*, two of the plaintiffs were given one weekend in which to decide, and another plaintiff was given only one day. These plaintiffs were first notified of the plan only five or six days before the deadline for the decision. There was also a factual issue of whether two of the plaintiffs were ever provided with relevant pension and insurance information. Therefore, summary judgment for the defendant was not appropriate. The Second Circuit explained that trial was necessary so that these facts could be considered together with the facts that the plaintiffs failed to ask for additional time to decide, failed to express dissatisfaction with the deadline, and affirmed on the plan acceptance form that their choice was voluntarily made. Also relevant was the possibility that plaintiffs felt pressured to accept the plan because of uncertain business conditions, rather than by the method of the plan's implementation. *Id.* at 84.

■ Here, plaintiffs' counsel argued that plaintiffs felt pressured by the short time period. This argument is not supported by the evidence that plaintiffs adduced at trial. The evidence produced at trial indicates that whoever requested more time to make a decision was given an extension. Furthermore, none of the five employees who testified on this issue complained to their supervisors about the time period, or requested additional time. None of this evidence was countered by evidence that the plaintiffs felt rushed, or were made uncomfortable by the deadlines.

Plaintiff Riggie testified that he received an early retirement offer on July 7, 1982. He had until July 31, 1982 to decide. Although Riggie stated that he never received a copy of the plan or a plan summary, he does recall receiving a plan booklet, which he never bothered to "pour through." Furthermore, he met with Hansen on July 21, 1982. On that date, Hansen explained the terms of the package to him, and provided him with a Pension Option Estimate. Riggie never requested additional time to decide. He testified that he had all the information necessary for him to make a decision. He consulted with his wife and family. He testified that the decision was his own, and was voluntary, although he stated there were unspecified "extraneous circumstances." Riggie accepted the offer of early retirement on July 28, 1982—two days before the deadline.

Plaintiff Andrews testified that she received an offer of the second early retirement package some time before April 15, 1983. She had until April 29, 1983 to decide. On April 15, 1983 she met with Hansen, who explained the terms of the package to her. She testified that she had all the necessary information by April 17, 1983. She accepted early retirement on April 29, 1983. Andrews did not testify that she had been rushed or that she felt uncomfortable with the deadline.

Plaintiff Kennedy testified that she received an offer of the second early retirement package on approximately April 11, 1983. She had until April 29, 1983 to decide. On April 11, 1983 she spoke to Hansen, who explained the terms of the package to her. Her only concern was that she wanted a reassurance that she would not be laid off if she refused the package, but she was not given a reassurance. She had sufficient time to consult with her husband, her family, and her fellow employees. Kennedy did not testify that she had been rushed or that she felt uncomfortable with the deadline. She accepted early retirement on April 29, 1983, the day of the deadline. She testified that she waited until the last day to accept in case she wanted to change her mind.

Plaintiff Salefske testified that he received an offer of enhanced early severance on January 26, 1983. He had until February 15, 1983 to decide. On January 28, 1983 Salefske met with Hansen, who explained the terms of the package to him. Salefske also met with Chrzanowski on that day. Chrzanowski informed him that Chrzanowski needed to have a decision by February 1, 1983. Salefske did not ask for an extension or object to the deadline. He accepted enhanced early severance on February 1, 1983. He did not testify that he had been rushed or that he felt uncomfortable with the deadline.

Plaintiff Wik testified that he received an offer of enhanced early severance on January 26, 1983. He had until February 15, 1983 to decide. On January 27, 1983 he met with corporate officers, who read the plan to him. They also read that the deadline was February 15, 1983, but told Wik that they wanted him to decide by January 31, 1983. On January 28, 1983 Hansen explained the terms of the package to him. Wik did not ask for more time to decide, nor did he object to the deadline. Wik signed the acceptance on January 31, 1983, but did not provide it to Chrzanowski until February 1, 1983. Nevertheless, his acceptance was not refused as untimely. Wik did not testify that he had been rushed or that he felt uncomfortable with the deadline.

Therefore, the facts of this case are similar to those in *Henn*, where the court wrote, "The plaintiffs in this case do not say that they lacked information about the terms of the offer. All had time to discuss the offer with families and financial advisers. They complain that they felt pressure and perceived the choice to be excruciating, but that is not important." *Id.* at 829. Here, the deadlines provided to the five plaintiffs above were, on the whole, significantly more generous than those implicated in *Paolillo*. More importantly, however, the evidence adduced at trial simply fails to support counsel's argument that the plaintiffs were rushed or railroaded into accepting the packages. None of the plaintiffs expressed such a sentiment, and there is no other evidence in the record indicating that defendant pressured or coerced plaintiffs into accepting the pack-

ages. Therefore, plaintiffs have failed to adduce sufficient evidence to support an inference that their acceptance of the packages was involuntary.

Finally, an exception to § 623(f)(2) has been recognized in cases of "constructive discharge"—that is, "working conditions so onerous or demeaning that the employee has effectively been fired in place and compelled to leave." *Henn*, 819 F.2d at 826. Nonetheless, plaintiffs can only prove constructive discharge if maintaining the status quo would violate the ADEA:

> [T]he appropriate question in early retirement cases [is] whether the existing conditions (ignoring the offer of early retirement) violate the ADEA....
>
> \* \* \* \* \* \*
>
> .... If the [defendant] ' could have discharged them lawfully—perhaps because business had turned sour, and [the plaintiffs] were not selling enough to cover their wage—then the fact that it may have discharged them "constructively" instead would be unimportant.

*Id.* at 829.

Thus, in *Henn*, the court determined that summary judgment for the defendant employer was warranted where "[t]he record contain[ed] extensive admissions by the plaintiffs [indicating] that any threats made to these plaintiffs while they were considering the offer were no greater than justified by their lack of sales." *Id.* at 830. Moreover, the court explained, "The reasonable inferences from this record would not allow a jury to infer that the plaintiffs would have been fired (in violation of the ADEA) had they turned down the offer of early retirement, and without such a constructive discharge they cannot undo their choice to retire." *Id.*

Similarly, in *Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir.1992), the court held that the record did not support plaintiffs' unsubstantiated claims of constructive discharge. The court explained that "there is nothing to indicate that [plaintiff] would have been fired had [she] not chosen to retire and accept the special [early retirement] payment [citation omitted].... More-

over, [defendant] was undergoing a restructuring in which many of its reporters were to be reassigned. The ADEA must not be permitted to become a mechanism to inhibit ordinary managerial decisions." *Id.* at 1082. The court also wrote:

> We recognize that [plaintiff] probably did perceive that the new management was less affable than that to which she had been accustomed, and we may assume that she subjectively believed that continued employment would have been uncomfortable and that she would have been demoted or terminated at some point in the future. However, as aptly stated by the Court of Appeals for the Fourth Circuit:
>
> > "the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh condition, *in excess of those faced by h[er] co-workers.* [Sh]e is not, however, guaranteed a working environment free from stress...."

*Id.* at 1083, *quoting Bistow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (emphasis added). See also *Karlen v. City Colleges of Chicago,* 837 F.2d 314, 317 (7th Cir.), *cert. denied,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988), holding that "a worker who elects early retirement cannot turn around and sue his employer unless he can show that he was forced to take early retirement by an explicit or implicit threat to fire (or otherwise punish) him *because of his age* if he did not." (emphasis added), *citing Henn,* 819 F.2d 824. This line of cases directly refutes the argument raised by plaintiffs' counsel during oral argument that an early retirement or enhanced severance package would violate the ADEA if an employee who refused the package faced termination for *any reason,* not just a discriminatory reason. See also *Mitchell v. Mobil Oil Corp.,* 896 F.2d 463 (10th Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990), holding:

> An employee who claims that an offer of early retirement constitutes age discrimination by constructive discharge can meet this burden by demonstrating that the offer 'sufficiently alters the status quo that each choice facing the employee makes him worse off' and that if he refuses the offer and decides to stay, his employer will treat him less favorably than other employees *because of his age.*

*Id.* at 467 (emphasis added), *quoting Bodnar,* 843 F.2d at 193.

In *Bodnar,* cited above, the Fifth Circuit addressed a situation where early retirement offers were made against the backdrop of layoffs. On September 28, 1983 the defendant corporation announced to all employees that it would be embarking on a dramatic cost reduction program, which would include a reduction in salary costs by ten to fifteen percent through normal and early retirement, as well as a reorganization to eliminate jobs. Twenty-eight employees were offered the early retirement program, on September 27 and 28, 1983. The program was not offered to certain employees deemed essential to the company. The offerees were given fifteen days to consider the package. A variable bonus of up to $20,000.00 was the incentive for early retirement. Eventually 21 of the 27 offerees accepted the package. Those who refused the package were not thereafter terminated by the defendant.

The plaintiffs in *Bodnar* alleged that they had been constructively discharged by the corporation. The claimed that they had been told they would not receive any benefits if they refused the plan and were later terminated by layoff. They were explicitly told that layoffs would follow. Requests for additional time to consider the offer beyond the fifteen day period were denied. *Id.* at 192.

The Fifth Circuit upheld an award of summary judgment for the defendant. Most importantly, the court explained, "Of course, no individual employee or employee group may claim constructive discharge where all employees are subject to the same working conditions." *Id.* at 193, *citing Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 926 (5th Cir.1982). Despite the fact that the employ-

ees were told of impending layoffs, the court held:

> ... the risk that their jobs might be eliminated because of economic pressure on the company [is] insufficient to suggest age discrimination.... Appellants' risk, if they stayed on, would be shared by all remaining employees of Synpol. Compare *Vaughn v. Pool Offshore, supra.* It is thus fair here, as in *Henn,* to say that the [early retirement plan] afforded Appellants a means to mitigate that risk which was not available to other employees.

*Id.* at 194. In addition, the court determined that fifteen days was adequate time to consider the offer, and that plaintiffs did, in fact, consult with others and examine their options.

Plaintiffs' testimony is essentially that they would have wished to continue working until normal retirement age. Most were dissatisfied with the reduction in monthly benefits that would result from early retirement or early severance. Most importantly, they believe they were pressured into accepting these options because they were not provided a guarantee that they would not be laid off if they refused. In fact, the evidence shows that those who did refuse these packages were not thereafter laid off, and plaintiff Riggie was told by supervisory personnel that he was not likely to be terminated. All in all, plaintiffs feared that they would be returned to the pool of employees who would be subject to layoff. Nonetheless, there is no evidence that layoffs would have been made on the basis of age, or in retaliation for refusing early retirement or early severance. Any comments made to the plaintiffs regarding the possibility of layoff were explained by plaintiffs themselves not as threats, but as refusals to guarantee continued employment.

■ The authority discussed above therefore entitles defendant to judgment as a matter of law on plaintiffs' disparate impact claim, and on the individual claims of the five employees discussed above. In *Henn,* the evidence showed that any threats made to the plaintiffs were no harsher than were justified by the plaintiffs' lack of sales. Similarly, Columbus McKinnon's refusal to guarantee continued employment was justified by business conditions and the likelihood of company-wide layoffs—layoffs that impacted workers age 40 and over less severely than younger workers. As in *Gray,* there is nothing to indicate that plaintiffs would have been peculiarly susceptible to layoff if they refused early retirement or enhanced severance. They simply would have shared the uncertainty of younger employees, and therefore were not subjected to conditions "in excess of those faced by [their] co-workers." *Gray,* 957 F.2d at 1083, *quoting Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). Although they may have feared retaliation, their subjective perceptions are not relevant to the issue of whether defendants discriminated against them on the basis of their age. Plaintiffs have utterly failed to raise an inference that they were "forced to take early retirement [or enhanced severance] by an explicit or implicit threat to fire (or otherwise punish) them because of [their] age if [they] did not." *Karlen,* 837 F.2d at 317, *citing Henn,* 819 F.2d at 824.

■ The status quo at Columbus McKinnon was uncertainty due to the risk of layoff. The company offered plaintiffs "a means to mitigate that risk which was not available to other employees." *Bodnar,* 843 F.2d at 194. Plaintiffs accepted defendant's offers, and have not raised an inference that their acceptance was involuntary or coerced, that they were constructively discharged, or that the packages were subterfuges to evade the purposes of the ADEA. Therefore, they may not be considered in the statistics to reach a finding of disparate impact. When these employees are not considered in the pool of terminated employees, no disparate impact is evident.

Therefore, judgment as a matter of law is awarded to defendant on plaintiffs' disparate impact claim. Likewise, judgment is awarded to defendant on the individual claims of plaintiffs Riggie, Andrews, Kennedy, Salefske, and Wik. Because these plaintiffs have failed to raise an inference of subterfuge, involuntariness, coercion, or constructive discharge, the early retirement and enhanced severance packages are considered to

be lawful under § 623(f)(2). For the same reasons, as well as evidence that they had not been replaced following their separation from Columbus McKinnon, these plaintiffs have failed to establish a prima facie case for age discrimination under the formula contained in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Judgment as a Matter of Law on Pattern or Practice Claim*

Defendant has moved for judgment as a matter of law on plaintiffs' pattern or practice claim. Defendant argues that plaintiffs have failed properly to demonstrate that defendant engaged in a pattern or practice of intentional age discrimination against employees age 40 or over. Defendant argues that the statistics relied upon by plaintiffs are not based upon a valid sample. Defendant further argues that when the number of employees terminated under the early retirement and enhanced severance packages is eliminated, there is no statistical showing of a disproportionate effect on older workers, and no prima facie case for age discrimination is established.

▮▮▮ Plaintiffs in this case have introduced all their evidence regarding their pattern or practice allegations. Under the ADEA, individual plaintiffs may raise a rebuttable inference that they were victims of disparate treatment by proving that the defendant engaged in a "pattern or practice" of intentional age discrimination. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). See also *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Plaintiffs cannot show a discriminatory pattern or practice simply by proving sporadic, isolated incidents of discrimination. Plaintiffs must "establish by a preponderance of the evidence that [age] discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855. Statistics can play an important role in establishing a pattern or practice of discrimination. In fact, "[w]here gross statistical disparities can be shown, they

alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) (citing *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856).

Nevertheless, "[f]or statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 944 (6th Cir.1987) (quoting *Segar v. Smith,* 738 F.2d 1249, 1274 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985)). The statistics upon which plaintiffs rely must refer to a proper sample of employees, and must not take impermissible factors into account.

Anecdotal evidence may also be critical in showing a pattern or practice of discrimination. Non-statistical evidence may "strengthen the inference of a pattern or practice of purposeful discrimination that can be drawn from a valid statistical showing of disparities in the work force." *Ste. Marie v. Eastern R. Ass'n,* 650 F.2d 395, 405 (2d Cir.1981). Nonetheless, where the anecdotal evidence is confined to a few individual incidents, the evidence may not be sufficient to raise an inference of a pattern or practice of discrimination. *Id.*

▮▮ In plaintiffs' Pretrial Statement, filed on August 14, 1992, plaintiffs provided a Statement of the Case. Plaintiffs stated at pages 4–5 of the Statement that they were a "class of [non-union] employees that were terminated by the defendant ... between the period of January 1, 1981 through August 3, 1983 and who were over 40 years of age.... We are now litigating the pattern of practice of CM and these terminations by their Cost Savings Plan and the disparate impact that it has upon those over the age of 40 years." During the initial stages of this trial, the parties agreed upon a Stipulation setting forth statistics pertaining to plaintiffs' claims (Court exh. 25). This Stipulation shows that on July 1, 1982 defendant employed 789 salaried, non-union factory and office employees. Of those employees, 54.2% were age 40 or

older. During the relevant period (July 1, 1982 through August 3, 1983) 101 of those employees were laid off and not rehired. 45.5% of those laid off and not rehired were age 40 or over. These are the relevant statistics in this trial because they are premised upon the number of employees in the plaintiff class. Nonetheless, there is no suggestion of age discrimination in these statistics. In fact, the figures conclusively show that older workers fared proportionately better than younger workers under the layoffs.

Throughout the course of this litigation, plaintiffs have relied on statistical testimony purportedly showing that defendant's alleged Cost Savings Plan had a disproportionate effect on employees age 40 and over. However, plaintiffs can show such an effect only when they include in the statistical sample those employees who voluntarily accepted one of the early retirement or enhanced early severance packages. This Court held in its March 2, 1993 Decision and Order that employees who accepted these packages could not be included in plaintiffs' statistical sample because plaintiffs were unable to raise an inference that these packages were subterfuges to evade the purposes of the ADEA, were involuntary, coercive, or were tantamount to constructive discharge. See 29 U.S.C. § 623(f)(2). Consequently, plaintiffs are left with no statistical support for their allegation that defendant engaged in a pattern or practice of intentional age discrimination—that terminations based upon the age of the employees was the standard operating procedure of the company.[9] See *Wingfield v. United Technologies Corp.*, 678 F.Supp. 973 (D.Conn.1988) (plaintiff cannot combine offers of early retirement with evidence of forced retirement, failure to promote older workers, and pay differences to imply a pattern or practice of age discrimination).

Therefore, this Court must look to the anecdotal evidence presented at trial to determine whether any reasonable jury could infer that an unlawful pattern or practice

existed. After doing so, it is clear that the inferences suggested by plaintiffs' counsel have no foundation in the record, and more often than not are refuted by plaintiffs' own evidence. First of all, plaintiffs' counsel argued that the layoffs were part of a centralized scheme to rid the company of older workers. The evidence produced at trial eliminates the possibility of such an inference, and is totally consistent with defendant's articulated reason of economic necessity. The evidence shows that the decisions regarding which employees to lay off were not made by one individual or one centralized group; rather, recommendations were submitted by various supervisory personnel in the company's various branch offices and factories throughout the territorial United States. Plaintiffs produced no evidence that these recommendations were not followed. Furthermore, substantial testimony was produced that recommendations were made on the basis of job performance and the need for employees in certain positions (see exh. 102). For example, plaintiff Cornwell recommended fellow-plaintiff Quesnell for layoff because her layoff would be "least disruptive" to her department. He testified that age played no role in the decision to recommend her for layoff. Likewise, plaintiff Grimes was terminated by defendant because, she was told, the nurse position was being eliminated. She had been the first nurse at the Midland facility, and she admitted during trial that Midland has not had a nurse since her layoff. She also admitted that she had no experience in arbitration, collective bargaining, and EEOC matters, as did Lawrence Nesset, the person at Midland Forge whom she assumed absorbed her duties in the area of safety. Thus plaintiffs' evidence does not show that defendants' articulated economic rationale was simply a ruse for a company-wide pattern of intentional discrimination.

Plaintiffs' counsel referred to exhibit 105, a list of employees recommended for the first

---

9. Furthermore, as will be discussed below, defendant has alleged that employees were recommended and chosen for layoff on the basis of their job performance and the expendability of their position. None of the plaintiffs have presented sufficient evidence to refute this proffered

justification. Therefore, plaintiffs' statistical evidence is even less reliable for its failure to control for the effects of job performance and assignment. See *King v. General Electric Co.*, 960 F.2d 617, 619 (7th Cir.1992).

layoff and/or employees eligible for the first early retirement plan. He argued that this exhibit raises an inference that defendant's officers conceived of a general plan to eliminate older workers. Nonetheless, the list does not indicate which employees were eligible for early retirement and which were recommended for layoff. The list does not indicate the age of any employee, and there is no other evidence that the employees' ages were known when the final decision to lay them off was made by the company's officers. The uncontroverted testimony of Ladds showed that his list was a running compilation of names submitted by various managers and supervisors, and simply included those employees whose performance and job responsibilities made them suitable for layoff. Similarly, exhibits 90, 97, and 98, upon which plaintiffs' counsel heavily relied during oral argument, offer no proof of a scheme to eliminate older workers. In fact, exhibit 90 explicitly states that some employees who were eligible for early retirement had previously been evaluated as marginal performers.

Plaintiffs' counsel also argued that exhibit 90 constitutes evidence of intentional age discrimination because it supposedly enumerates the employees that defendant wished to terminate, and that 68% of these employees were age 40 or over. This is nothing but a naked assertion. The document does not indicate the ages of the employees, and plaintiffs have offered no evidence regarding many of the employees listed in the document. Therefore, there is no evidentiary basis for plaintiffs' 68% figure in the record to support an inference of a pattern or practice of age discrimination. Furthermore, the list contains employees who chose voluntary early retirement: evidence concerning these employees cannot be considered as evidence of age discrimination under § 623(f)(2), according to this Court's Decision and Order of March 2, 1993. See *Henn v. National Geographic Society,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987).

Plaintiffs' counsel indicated that some of the names of the terminated employees were missing from exhibit 105; he argued that this was somehow suspicious. However, this fact militates *against* an inference of a pattern or practice of discrimination. The reason that some of the terminated employees were not on the list is because such employees were not laid off until 1983, whereas exhibit 90 was prepared before the first set of layoffs in July 1982. This suggests that there was no "general scheme" to terminate certain workers, and uncontroverted testimony was introduced showing that defendant did not know in 1982 whom it would be laying of in 1983, or even that it would be laying off any employees at all. Therefore, no inference of discrimination can be drawn by the mere existence of a document containing a list of all those employees recommended for layoff.

Nor does exhibit 92, the "Discussion Memo", raise an inference that terminations were impermissibly based upon age. This Memo evaluates the advantages and disadvantages of the different methods of addressing defendant's financial crisis. Although the Memo states at page 4 that early retirement "may clear [a] path for future advancement," this would not be sufficient to warrant a finding that the early retirement plans were subterfuges to evade the purposes of the ADEA, 29 U.S.C. § 623(f)(2); nor would it support a finding of a pattern or practice of intentional age discrimination. Importantly, plaintiffs failed to adduce any evidence that older workers were not entitled to "advancement". Indeed, the evidence shows that promotions were awarded to certain employees who were considerably older than many of the employees laid off. Cf. *EEOC v. Home Ins. Co.,* 672 F.2d 252 (2d Cir.1982), in which the court, under then-existing burden of proof rules, held that the defendant corporation had failed to prove that its early retirement plan was not a subterfuge under 29 U.S.C. § 623(f)(2). In that case, the defendant maintained that its early retirement plan was a legitimate means to promote advancement. The court wrote, "The defect in this reason results from the fact that as a result of the *forced* retirements at age 62, no employee between the ages of 62 and 65 could qualify for promotion." *Id.* at 262 (emphasis added). In the present case, no forced retirement plan was imposed: both the early retirement and enhanced severance packages were voluntary. In addition, the

evidence shows that opportunities for advancement were not age-based. Moreover, on the same page the Memo lists the disadvantage of the early retirement: that it "must be offered to entire group that meets the age and service definition decided upon—may lose some people we would prefer to keep." This directly cuts against a finding of intentional discrimination and manifests a preference for terminating employees based on their merit and their value to the company—not on their age.

Plaintiffs' counsel made much of the fact that employees' ages were listed on cards that were maintained in defendant's various facilities and were used for payroll purposes. However, counsel neglected to address federal regulations requiring employers to maintain such records. A regulation of the Equal Employment Opportunity Commission ("EEOC"), 29 C.F.R. § 1627.3(a)(3) (1982, 1983) specifically provided that employers shall make and keep for at least three years payroll or other records that include the employees' date of birth. "[T]he mere maintenance of such information, *absent direct evidence that it was used in making adverse employment decisions,* cannot create even a circumstantial inference of discrimination." *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 514 (6th Cir.1991) (emphasis added). Here, there is neither direct nor circumstantial evidence indicating that defendant's payroll records were consulted or played any role at all in employment decisions. Mr. Hansen testified that these records were kept under lock and key at his facility, and there is no evidence that any of the various decisionmakers accessed them at any time. Therefore, the existence of the payroll records is no evidence of a pattern or practice of age discrimination.

Similarly, plaintiffs' counsel relied heavily on the "guards memo", exhibit 101. He argued that the birth dates penciled on the memo raise an inference that the decisionmakers knew and considered the ages of the terminated guards at the time of the layoffs. Nonetheless, uncontradicted testimony was elicited from Mr. Hansen during plaintiff's case indicating that these birth dates were penciled on the memo *after* the guards had already been chosen for layoff, so that Hansen could calculate the severance benefits to which these guards were entitled. Even if this were not the case, evidence of age discrimination with respect to three guards at one corporate facility would not be sufficient to raise an inference of a company-wide policy of discrimination. See *Haskell v. Kaman Corp.,* 743 F.2d 113, 121 (2d Cir. 1984), in which the Second Circuit held that "for [ ] statistical evidence to be probative [ ] the sample must be large enough to permit an inference that age was a determinative factor in the employer's decision."

Plaintiffs' counsel argued that because each of the terminated employees had at least adequate performance reviews or were never told their performance was lacking, defendant's explanation that layoffs were based upon job performance and expendability is merely a cover-up for age discrimination. Nonetheless, plaintiffs introduced few comparative performance reviews regarding younger employees. Without such comparisons, the evidence is insufficient to call defendant's justification into question.

Similarly, plaintiffs' counsel argued that the laid off employees received regular wage increases. Again, however, plaintiffs offered no comparative evidence regarding younger employees. In addition, evidence was adduced that wage increases were provided regularly to *all* employees, and that these increases resulted from job grade increases that paralleled increases awarded to the unionized work force. The evidence that does exist shows that lower wage increases were provided to employees who were performing less satisfactorily than others. For instance, plaintiff Libront received lower performance reviews than Grant and Hansen, and therefore received less than the general increase for his job grade. Consequently, plaintiffs' evidence raises no inference of systematic age discrimination.

Plaintiffs' counsel also argued that, when viewed in the "totality of the evidence", defendant's failure to base layoffs on seniority could raise an inference of age discrimination. Plaintiffs adduced evidence that seniority had been used in connection with temporary layoffs at the Lexington and Manatee

facilities at different times. Plaintiffs' argument is answered by *Williams v. General Motors Corp.*, 656 F.2d 120, 128 n. 17 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982), where the court wrote, "We state without equivocation that the seniority a given plaintiff has accumulated entitles him to no better or worse treatment in an age discrimination suit." See also *Ludovicy v. Dunkirk Radiator Corp.*, 922 F.2d 109 (2d Cir.1990), in which the Second Circuit cited *Williams* and explained that because seniority is not necessarily a correlate of age, it is not ordinarily a relevant factor in an age discrimination case.

▮ There is no merit to plaintiffs' argument that older workers were systematically discriminated against because they were not offered the opportunity to transfer to another facility. Again, plaintiffs have produced no comparative evidence relating to younger workers. There is no evidence of any younger workers being transferred during the relevant period, and no inference of age discrimination arises. In *Kesselring v. United Technologies*, 753 F.Supp. 1359 (S.D.Ohio 1991), the court explained that "[a]n employer has no duty under the ADEA to permit an employee to transfer to another position or to displace workers with less seniority, when the employee's position is eliminated as part of a work force reduction." *Id.* at 1367 (citing *Barnes v. Gencorp. Inc.*, 896 F.2d 1457, 1469 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990) and *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir. 1986)). In *Kesselring*, the court noted that plaintiff had failed to introduce evidence that it was economically feasible for the defendant corporation to transfer him to another facility. Similarly, plaintiffs in the present case have failed to demonstrate that transfer was an option, or that younger employees were transferred and they were not. In any event, plaintiffs have failed to show even sporadic, isolated incidents of intentional age discrimination.

▮ Finally, there is no evidence to support plaintiffs' speculation that the layoffs were manipulated to retaliate against older workers who chose not to accept early retirement. First of all, the layoffs in both 1982

and 1983 were implemented *before* the early retirement packages were offered, and defendant had no way of predicting which employees would accept these packages and which would refuse them. Second, uncontradicted evidence was adduced during plaintiffs' case showing that no employee who refused an offer of voluntary early retirement or voluntary enhanced early severance was thereafter laid off by defendant.

Plaintiffs' failure to produce evidence of a pattern or practice of age discrimination was countered by testimony indicating that layoffs were based upon legitimate economic factors, and that employees were recommended for layoff based upon merit and the expendability of their job positions. Evidence of poor economic conditions stands unrebutted. Plaintiff Widener was given a job evaluation of below average (exh. 106–B), and plaintiff Libront's performance, as indicated above, was the lowest in the personnel department. Furthermore, all of the supervisors who recommended employees for layoff were over the age of 40; many of them were older than the employees they recommended for termination. Although not dispositive because every reasonable inference must be given to the plaintiffs, this evidence stands in stark contrast to the lack of evidence of intentional, company-wide discrimination.

The tenuousness of plaintiffs' pattern or practice claim is demonstrated by their counsel's argument that judgment should not be rendered on this claim because the jury has not yet heard the testimony of plaintiffs' former supervisors as to whether they knew of the ages of the employees they recommended for layoff. Further, counsel stated that the evidence of comparative performance reviews has not yet been introduced. Plaintiffs apparently do not recognize that such evidence was essential to establish their prima facie case of a pattern or practice of age discrimination. Because plaintiffs have rested their case without introducing such evidence, they have lost on this claim. Therefore, judgment as a matter of law will be awarded to defendant on plaintiffs' pattern or practice claim.

## PLAINTIFFS' INDIVIDUAL CLAIMS

 Because plaintiffs have failed to raise a reasonable inference that defendant engaged in a pattern or practice of intentional age discrimination during the relevant period, no individual plaintiff is entitled to the inference that his or her particular layoff was unlawful. See *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Therefore, each individual plaintiff must establish a prima facie case of age discrimination under the formula contained in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[10] Under this formula, a plaintiff alleging age discrimination has the burden of proving that he or she: (1) was age 40 or over at the time of layoff; (2) was qualified for the position he or she held; (3) was terminated; and (4) was replaced by a younger worker, or that the defendant continued to hold plaintiff's job open and to solicit applications from persons of plaintiff's qualifications. *Id.* at 802, 93 S.Ct. at 1824. This formula has been tailored to reduction in force cases, so as not to require the plaintiff to prove that he or she was replaced by someone who was newly hired. Instead, a plaintiff may satisfy his or her prima facie burden by showing that "the discharge occurred under circumstances giving rise to an inference of age discrimination." *Montana v. First Fed. Savings & Loan of Rochester*, 869 F.2d 100, 104 (2d Cir.1989). As always, the central question in such a case is "whether the plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that age was a determinative factor in the employer's decision." *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 81 (2d Cir. 1983).

 If an individual plaintiff can establish a prima facie case of age discrimination, the defendant has the burden of articulating a legitimate, lawful reason for the termination of that individual. Then, the plaintiff has "the opportunity to persuade the fact-finder that the employer's proffered reason is not the true reason but only a pretext designed to deflect attention from the true reason." *Holo–Krome Co. v. NLRB*, 954 F.2d 108, 110 (2d Cir.1992). A plaintiff can prove pretext either by demonstrating that "a discriminatory reason more likely than not motivated the employer, or by [demonstrating] that the employer's proffered explanation is unworthy of belief." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825). Although the individual plaintiff carries the burden of proof throughout the case, the plaintiff need not prove that age was the only factor that led to his or her termination, simply that "age was a determinative factor." *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 317 (2d Cir.1992) (citing *Montana*, 869 F.2d at 105).

### Willfulness

It is appropriate to note at this point that thirteen of the plaintiffs who remain in this action had the additional burden of proving that any violation of their rights under the ADEA was willful. These plaintiffs are Carere, Clark, Cornwell, Dorko, Ferris, Grimes, Hodkin, Long, Luke, Mikos, Rook, Thomas, and Widener. In a Decision and Order dated July 13, 1987 ("Elfvin"), Judge Elfvin held that these thirteen plaintiffs had failed to file their written consent to opt into the class within two years of the dates they received notice of their termination. Therefore, they could only recover for willful violations of the

---

**10.** *McDonnell Douglas* analysis will be employed in this case rather than the analysis contained in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Plaintiffs' counsel admitted during his opening statement that the plaintiffs had no direct evidence of age discrimination, and both counsel employed "pretext" analysis during oral argument. Furthermore, this Court has reviewed the record and has found no direct evidence of age discrimination. It should be noted that in this context "direct evidence" does not mean "non-circumstantial" evidence. Instead, it means statements or actions by the defendant "reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir.1992).

624

ADEA. This is because Section 7(e) of the ADEA, 29 U.S.C. § 626(e)(1), incorporates the statute of limitations provisions in Section 6(a) of the Portal-to-Portal Act, 29 U.S.C. § 255(a). Section 255(a) provides a two year limitations period for violations, and a three year limitations period for willful violations. Judge Elfvin also addressed § 256(b), and explained that:

> ... in an ADEA class action, the action is commenced for each individual plaintiff not originally named as a plaintiff and for each plaintiff who provided written consent to become a party, "on the date on which [his] written consent [to become a party plaintiff] is filed in the court in which the action was commenced." 29 U.S.C. § 256(b). Here the intervenors' consents had been filed March 1, 1985. The statute is clear and this Court cannot agree with the Plaintiffs' assertion that the period of limitations runs from the opt-in date. Thus these [ ] Plaintiffs will be constrained to the proving of a willful violation of the ADEA.

Elfvin, pp. 7–8.

Now, nearly six years after Judge Elfvin's decision on this issue, plaintiffs' counsel requested during oral argument of the present motion that this Court revisit Judge Elfvin's decision. Plaintiff now argues for a tolling of the applicable statute of limitations due to the length of time Judge Elfvin spent resolving plaintiff's "class certification" motion, and due to subsequent case law. In other words, plaintiff asks this Court to reverse what has become the law of the case.

■ "Law of the case is ... a discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided." *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982). Nonetheless, under certain circumstances, review of another judge's decision becomes appropriate. One such circumstance is where there has been an intervening change in the controlling law that contradicts the prior judge's decision, provided, of course, that principles of due process and retroactivity are not thereby violated. *Baden v. Koch*, 799 F.2d 825, 828 (2d Cir.1986).

■ In light of these considerations, this Court finds that reversal of Judge Elfvin's decision is not warranted in this case. Although this Court repeatedly asked counsel during pretrial proceedings whether there were any outstanding issues to address, plaintiffs' counsel did not mention the statute of limitations issue. During the most recent oral argument, plaintiffs' counsel indicated that he had, for some reason, included a discussion of this issue at pages 18–19 of plaintiffs' Memorandum of Law in Opposition to Columbus McKinnon's Motion in Limine regarding plaintiffs' disparate impact claim. That Memorandum was filed on October 23, 1992. Nevertheless, plaintiffs made no motion regarding the statute of limitations issue, and counsel never raised the issue until now. Consequently, this Court explained to plaintiffs' counsel that a "motion to reconsider" Judge Elfvin's decision after plaintiffs had rested at trial was very untimely, but that this Court would reconsider the decision sua sponte if the case law cited by plaintiffs' counsel so warranted. After reviewing the case law in depth, this Court has determined that reconsideration is not warranted.

The case law cited by plaintiffs' counsel addresses the discrete issues of: (1) whether, as Judge Elfvin held, plaintiffs in ADEA actions are bound by the statutory provisions regarding commencement of an action contained in 29 U.S.C. § 256; and (2) if so, whether an equitable tolling period is available under the present circumstances. However, the few intervening cases that exist reach dissimilar results. For example, *Mooney v. Aramco Servs. Co.*, 764 F.Supp. 461 (S.D.Tex.1991) concludes that "Section 256 is not among the sections of the FLSA incorporated into the ADEA.", *citing Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). Therefore, the court held that the claims of the opt-in plaintiffs related back to the date the original complaint was filed. *Id.* at 464. On the other hand, *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393 (8th Cir.1987) holds that § 256 *does* apply to ADEA plaintiffs, and that a plaintiff's action "commences when he opts into the action by filing written consent

with the court in which the action is pending." *Id.* at 394. Furthermore, the court wrote, "Plaintiffs argued that [§ 256] had not been expressly incorporated by reference into the ADEA. This Circuit had never ruled on the point, and plaintiffs were entitled to urge it, but we agree ... that it is without merit." *Id.* Thus a conflict exists between the Sixth and Eighth Circuits. Finally, there is case law indicating that § 256 does apply to the ADEA, but that an equitable tolling period is available if the "opting-in" process is delayed. *Owens v. Bethlehem Mines Corp.,* 630 F.Supp. 309 (S.D.W.Va. 1986); *Sperling v. Hoffman–La Roche, Inc.,* 118 F.R.D. 392 (D.N.J.1988), *aff'd in part and appeal rev'd in part,* 862 F.2d 439 (3d Cir.1988), *aff'd,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Significantly, the Second Circuit has not addressed this issue. Therefore, this Court finds no reason to disturb Judge Elfvin's earlier Decision and Order regarding this issue. The thirteen plaintiffs listed above were required to prove that age was a determinative factor in their layoffs, and that defendant willfully discriminated against each plaintiff.

In *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Supreme Court explained that under the FLSA, willful conduct is conduct that demonstrates "that the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 133, 108 S.Ct. at 1681. Although *McLaughlin* dealt with a violation of the FLSA, the Court explicitly stated that this definition applied to cases under the ADEA. *Id.* at 131 and n. 5, 108 S.Ct. at 1680 and n. 5. Even before *McLaughlin,* the Second Circuit had used this definition of a willful violation in ADEA cases. See, e.g., *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40 (2d Cir.1988). Willfulness is often found where the defendant took steps to conceal its violation of the ADEA, *Benjamin v. United Merchants & Mfrs., Inc.,* 873 F.2d 41 (2d Cir.1989), or where defendant's termination of the plaintiff was retaliatory in nature, *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1256 (2d Cir.1987). It is clear that each individual

plaintiff has the burden of proving willfulness. *Benjamin,* 873 F.2d at 43.

In the present case, the claims of plaintiffs Carere, Clark, Cornwell, Dorko, Ferris, Grimes, Hodkin, Long, Luke, Mikos, Rook, Thomas, and Widener must fail because each has failed to adduce any evidence to support a reasonable inference that his or her layoff was the result of a willful violation of the ADEA by defendant. During oral argument, plaintiffs' counsel stated that defendant willfully discriminated against each of the plaintiffs because it knew that employment decisions were governed by the ADEA. Plaintiffs introduced the testimony of Libront, who indicated that he had advised defendant in the past about EEOC regulations, and that defendant was aware of the ADEA. Furthermore, counsel argued that the company had "reacted to" to the ADEA in the past by making sure it complied with the statute. Nevertheless, none of the individual plaintiffs listed above or the plaintiffs as a group have adduced any evidence that would support a reasonable inference that defendant had actual knowledge that any layoff would violate the ADEA, or acted in reckless disregard of the statute. In *Russo,* the Second Circuit held that evidence the defendant knew the ADEA was "in the picture" is insufficient to prove a willful violation. *Id.* at 45 (citing *Trans World Airlines v. Thurston,* 469 U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985)). Likewise, plaintiffs' proof that defendant knew the ADEA was "in the picture" and had previously "reacted to it" is insufficient proof of willfulness. See *Stanojev v. Ebasco Servs., Inc.,* 643 F.2d 914 (2d Cir.1981) (evidence that defendant was aware of impending amendment to ADEA and was studying its likely effect was insufficient to support inference that defendant was motivated by the impending amendment to force the plaintiff into early retirement).

Moreover, this Court has fully reviewed the evidence pertaining to the thirteen plaintiffs listed above, affording every reasonable inference to plaintiffs, and has determined that these plaintiffs have failed to raise an inference that age was a motivating factor in their terminations. Therefore, judgment as

a matter of law will be awarded to defendant on the claims of these thirteen plaintiffs on this basis as well.

*Plaintiffs' Individual Claims*

Now, this Court will proceed to address the individual claims of the ten remaining plaintiffs: Barnes, Habicht, Koval, Kreutzer, Larkey, Libront, Nowark, Quesnell, Suits, and Taylor. It will use the burden shifting analysis contained in *McDonnell Douglas*, because each of these plaintiffs alleges that the defendant's articulated reasons for laying him or her off are pretextual. This Court is also aware of additional factors implicated in reduction in force cases. See, e.g., *Montana*, 869 F.2d at 104; *Maresco v. Evans Chemetics*, 964 F.2d 106 (2d Cir.1992). For instance, the Second Circuit held in *Montana* that in a reduction in force case the plaintiff need not show that he or she was replaced in order to establish a prima facie case; he or she need only show that "the discharge occurred under circumstances giving rise to an inference of age discrimination." *Id.* at 104. In *Montana*, the court determined that the plaintiff had met the fourth prong of the *McDonnell Douglas* formula by showing that: (1) the majority of her job responsibilities were not eliminated, but were transferred to a considerably younger worker who was considerably overworked; (2) shortly thereafter some of the younger worker's responsibilities were transferred to a newly-hired woman of the same age; and (3) the plaintiff was not offered either of these positions. Furthermore, the court determined that the plaintiff had produced sufficient evidence to withstand summary judgment on the issue of pretext by showing that: (1) she was the oldest and highest paid non-clerical worker in the department; (2) she was the only department head whose position was consolidated and whose staff continued without her; (3) she was not offered the opportunity for a transfer to the consolidated office; (4) after her termination, her duties were not eliminated, but were reassigned to a considerably younger worker who was considerably overworked, and shortly thereafter some of the younger worker's responsibilities were transferred to a newly-hired woman of the same age; (5) the defendant failed to consider plaintiff for a position created after her termination; and (6) after plaintiff's discharge, ostensibly as part of a reduction in force, the defendant added to its workforce in plaintiff's former department and created new positions, but did not consider plaintiff for those positions.

Several important factors immediately distinguish *Montana* from the present case. First of all, the reduction in force at issue in *Montana* merely involved the consolidation of the personnel departments of two branches into one central office. The layoffs in the present case were much more widespread: they impacted all of defendant's facilities throughout the eastern United States. They affected clerical and non-clerical employees alike. Therefore, a focus on single facilities, departments, or job positions is not as useful here as it was in *Montana*. Second, some of the younger employees in *Montana* were asked to transfer to the consolidated personnel department at corporate headquarters. Here, plaintiffs have produced no evidence showing that younger employees had the opportunity to transfer among defendant's various facilities during the relevant period. Third, in *Montana* the plaintiff's job duties were not eliminated, and were assumed by a younger employee who thereby became overburdened. Here, the evidence reveals that plaintiffs' job positions were expendable, and that, although in some instances a younger worker may have assumed some of a plaintiff's responsibilities, the plaintiff's position was indeed eliminated. Finally, in *Montana* the defendant corporation created new positions in the plaintiff's former department. In the present case, there were no new positions created in any of the plaintiffs' departments, and there were no new hires, with the exception of plaintiff Habicht. This is consistent with evidence of the dramatic 41% reduction in the work force that occurred during the relevant period (see exh. 786).

Defendant concedes that each of the ten remaining plaintiffs was a member of the protected age group, was qualified for his or her position, and was terminated. Therefore, the only remaining issues are whether each remaining plaintiff has produced evidence sufficient to support a reasonable inference that his or her layoff "occurred under

circumstances giving rise to an inference of age discrimination," *id.* at 104, and that defendant's articulated explanation that the layoffs were based upon severe business conditions and that recommendations for layoff were based upon job performance and the expendability of job positions is merely a pretext.

*Plaintiff Jean Barnes*

 Barnes was a billing clerk in the Information Systems Department at the Amherst headquarters. She was hired at age 48, and was therefore already a member of the protected class. She was the second oldest employee in her department. The oldest was Quinzio, who later retired. However, she was the lowest paid employee in her department. Barnes was laid off in July 1982 at age 55. She received a telephone call from Roger Habberfield, who told her that her layoff was immediate (exh. 511). She was told that she was being laid off due to poor economic conditions, and that her position was being eliminated. She was told that business was bad, and that there was a reduction in the volume of work. Her position was being eliminated because of the new payroll system that made the preparation of vacation and sick time sheets unnecessary. The preparation of these time sheets constituted a substantial part of her duties, and was taken over by computer. Her position was eliminated, and no one was hired to replace her. Some of her duties were absorbed by two younger females in the department whom Barnes had previously trained. Although plaintiffs' counsel argued that there were no other layoffs in Barnes' department, this is not the case. There were five other employees laid off during the relevant period. Three were under age 40 and two were over age 40 (exh. 698).

Although Barnes received a generally favorable performance appraisal, she received an overall rating of slightly below average, and received a rating of below average in judgment, attitude, and dealing with other people (exh. 11–D). Montgomery testified that part of her problem was that friction existed between her and the executive secretaries, who were given more generous time privileges than other secretaries.

This Court finds that Barnes has not established a prima facie case of age discrimination. Although two younger employees absorbed some of her job functions, they were not newly-hired or transferred. The evidence also shows that many of Barnes' job duties were eliminated through changes in policies or through automation. There is no proof that the younger employees "replaced" her, or were overburdened by their new responsibilities. Finally, plaintiff produced no comparative evidence regarding these employees.

Even if Barnes established a prima facie case, she has nonetheless failed to raise an inference that a "discriminatory reason more likely than not motivated the employer, or that the employer's proffered explanation is unworthy of belief." *Tyler,* 958 F.2d at 1181. Barnes claims that defendant's articulated reasons for her layoff are merely a pretext for age discrimination. Her primary argument is that layoffs should have been based on seniority. She also indicates that she was not provided the opportunity for a transfer, and that her performance review is dated August 10, 1982, although she was laid off on July 9, 1982.

 This Court has already explained that because seniority is not necessarily a correlate of age, it is usually not a relevant factor to be considered in age discrimination cases. See *Kesselring v. United Technologies,* 753 F.Supp. 1359 (S.D.Ohio 1991). Similarly, this Court has already explained that no inference can be drawn from the defendant's failure to offer plaintiffs the opportunity for a transfer because there is no evidence that there were any transfers during the relevant period.

 Nor is the post-layoff date of the performance review sufficient to create an inference that Barnes' layoff "occurred under circumstances giving rise to an inference of age discrimination." *Montana,* 869 F.2d at 104. First of all, Barnes' ratings were only slightly less favorable than earlier ratings. Furthermore, even if the date of the review gives rise to an inference that defendant wished to justify its actions after the layoff, the date of the memo alone is insufficient to

meet plaintiff's burden of proving pretext for age discrimination. To prove pretext, an age discrimination plaintiff must " 'do more than simply refute or cast doubt,' on the employer's rationale. He must 'also show a discriminatory animus based on age.' [citation omitted] The key question becomes whether the employer fired plaintiff *because of his age.*" *Connell v. Bank of Boston,* 924 F.2d 1169 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991) (emphasis added). Although plaintiff need not produce direct evidence of discriminatory animus, he or she must nevertheless produce evidence sufficient to raise an inference that the decision to terminate plaintiff was age-motivated.

Barnes has done nothing to discredit defendant's articulated reason by showing that defendant laid her off *because of her age.* See *Anderson v. Stauffer Chem. Co.,* 965 F.2d 397 (7th Cir.1992). In *Anderson,* the court held that the plaintiff failed to prove that the defendant's articulated reasons for her termination, which included complaints about her ability to get along with others, were pretextual. The plaintiff had alleged that defendant created an artificial "paper trail" to support its decision to fire him. Nonetheless, because he failed to produce evidence sufficient to show that these complaints against him were fabricated or unfounded, and because there was evidence that plaintiff was aware of certain complaints, the court found that plaintiff had failed to meet his burden of proving pretext.

In the present case, Barnes has failed to produce any evidence that the performance evaluation was manufactured in an attempt to justify her layoff, and that her layoff was motivated by age. Thus her theory is, at best, speculation, and speculation is not enough to prove age discrimination. *Id.* at 402. Therefore, judgment as a matter of law will be awarded to defendant on her claim.

*Plaintiff Dale Habicht*

 Habicht was an electrical engineer in the product standards and services department in Amherst. He was hired in December 1982 at age 44, and was therefore already a member of the protected age group. He was advised of an impending pay cut even before he accepted the job. He was not the oldest employee in his department. Habicht was laid off in April 1983—only four months after being hired—by the same individual who hired him. Of the eight employees in his department, four were older than Habicht and none were laid off. One 61 year old employee, Swenson, was temporarily laid off, but was immediately rehired.

Habicht was told that he was being laid off for economic reasons and a general cutback in the workforce. Exhibit 544 was introduced, showing that Habicht was a poor writer, and that his mechanical and analytical skills were weak. Habicht's duties were assumed by Larry Myhill, a 33 year-old employee who came into the department from the product design and engineering department next door (exh. 713). Myhill was a technician, not an engineer, and had thirteen months of service with the company.

Even if Habicht established a prima facie case for age discrimination based on the fact that Myhill came in from another department to do his job, Habicht has entirely failed to raise an inference that defendant's articulated reason for terminating him was pretextual. He offered no evidence of pretext, aside from an allegation that perhaps economic conditions were not that bad. Furthermore, he received performance reviews citing deficiencies. He offered no comparative reviews for Myhill, and introduced no evidence showing that age had anything to do with bringing Myhill into the department. Habicht was 44 when hired and when laid off. He was hired and laid off by the same individual. His employment card did not list his age or date of birth (exh. 29–A). Older employees in the department were not laid off. Finally, he received a letter of recommendation from the company (exh. 30).

Therefore, Habicht has failed to prove that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler,* 958 F.2d at 1181 (citations omitted). He has failed to raise an inference that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

*Plaintiff Edmund Koval*

 Koval was a project engineer at the Tonawanda facility (exh. 38). He was hired when he was 49 and was therefore already a member of the protected age group. Koval had not been terminated as part of the first five layoffs in July 1982, which included an administrative engineer and an engineer. Twelve employees who were older than Koval were not selected for layoff at that time, and a thirty-one year old employee was laid off (exh. 662). Although Koval was recommended for layoff in July 1982, he was not laid off. However, he was demoted from project engineer to engineer. Nonetheless, he does not claim that his demotion was based on his age, only his layoff.

Koval was laid off in April 1983 at age 57. He was neither the oldest nor the highest paid in his department. In fact, there were nine older employees in the department, and none of them were laid off (exh. 707).[11] Koval was told that he had been selected for layoff because his job performance was below expectations, and that there simply was not enough work for him to do. He challenges this explanation as pretextual. Nonetheless, Koval admitted that he knew the company was having economic problems. He further admitted that he had less work than the other project engineers in his department. In fact, the New York State Division of Human Rights found that Koval was "laid off as a result of [his] involvement in only one (1) component of a major project while others were involved in several components" (exh. 662). Koval's performance was described as "below expectations" (exh. 686). In addition, a younger engineer, Wagner, was laid off on the same day as Koval. Wagner was 36 years old, and did not have a good performance review (exh. 731). Like Koval, Wagner was involved in only one component of the major project (exh. 662).

Even when every reasonable inference is afforded plaintiff, he fails to establish a prima facie case of age discrimination, Koval has not raised an inference that his layoff "occurred under circumstances giving rise to an inference of age discrimination." *Montana*, 869 F.2d at 104. Rather, the evidence shows that the two weakest performing engineers were laid off, due to poor economic conditions. Older employees were not laid off. Even if plaintiff raised such an inference, he has not adduced sufficient evidence to infer that "a discriminatory reason more likely than not motivated the employer, or ... that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). Therefore, Koval has failed to raise an inference that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

*Plaintiff Kenneth Kreutzer*

 Kreutzer was a clerk in the production control department at defendant's Tonawanda facility. He was hired at age 48, and was therefore already a member of the protected class. He was not the oldest employee in the production control department, and no evidence was presented comparing his pay to other employees. In January 1983 two employees in Kreutzer's department were laid off; one employee was 41 years old, and the other (Mary Kolpak) was 23 years old.

Kreutzer was laid off in April 1983 at age 54. Addison Martin, the 58 year-old manager, told Kreutzer that his layoff was due to slow business and a general business decline. Although there were originally ten employees in the department, including Martin, this number dropped to 4 in one year: 3 employees were laid off; 3 employees, including Martin, chose voluntary early retirement; and one chose voluntary enhanced early severance (exh. 699). Mary Kolpak was re-hired in July 1983 and started doing Kreutzer's former job.

11. As explained above, no inference can be drawn from the fact that some of the older workers in the various departments subsequently accepted a voluntary early retirement package. The uncontradicted evidence shows that the early retirement packages were offered only after the layoffs had been completed. Defendant had no way of knowing who would accept voluntary early retirement at the time the recommendations for layoff were being made. Consequently, plaintiffs cannot consider themselves the oldest employees in their departments only by failing to account for older employees who accepted voluntary early retirement.

Even if Kreutzer established a prima facie case of age discrimination by relying on the re-hire of Mary Kolpak, no evidence was produced at trial showing that defendant's articulated reason for terminating him was pretextual. First, no evidence was presented that Kreutzer sought to return to his previous job and was rejected in favor of Kolpak. Kreutzer was not the oldest employee to be laid off. Furthermore, plaintiff introduced no comparative performance or pay information. There is no evidence contradicting the fact that the department was severely cut back due to a business decline. Finally, it is significant that Kolpak was not re-hired until three months after plaintiff was laid off. He has failed to show that the decision to re-hire Kolpak had anything to do with age.

Therefore, Kreutzer has failed to prove that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). He has failed to raise an inference that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

*Plaintiff Stuart Larkey*

■ Larkey was an assistant buyer in the Damascus facility. He was hired in November 1974. He was not the oldest or the highest paid in his department (exh. 734). Larkey was laid off in July 1983 at age 46. He was told that he was selected for layoff because the company was trying to save money. Of the three assistant buyers, he had the least seniority, although he had greater departmental seniority. Two employees under the age of 40 were laid off, and one 50 year-old employee was retained. Hugh Grant accepted voluntary early retirement at age 60, but was later asked to return to the company.

Even when every reasonable inference is afforded plaintiff, he fails to establish a prima facie case of age discrimination. Larkey has not raised an inference that his layoff "occurred under circumstances giving rise to an inference of age discrimination." *Montana*, 869 F.2d at 104. Rather, the evidence shows that Larkey was considered the lowest rated of the assistant buyers, and was laid off due to poor economic conditions. Older employees were not laid off. Moreover, Larkey's "termination review" prepared by Carlton Bjerke states, "Advised Stuart of situation i.e. he was laid [sic] off. As expected he was hurt but admitted he had a premonition it was going to happen. I assured him I would assist by way of recommendation." (exh. 567).

Even if Larkey established a prima facie case, he has not adduced sufficient evidence to suggest that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). He has produced no evidence that the reasons articulated for his layoff were pretextual, or that company seniority was not used. Exhibit 107–C indicates that Larkey was the weakest of the three assistant buyers in the department, and that he had the least seniority. His employment card did not contain his age or birth date (exh. 41). Therefore, Larkey has failed to raise an inference that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

*Plaintiff Jan Libront*

■ Libront characterizes his claim as forced early retirement, whereas defendant maintains that Libront was laid off. Therefore, this Court will evaluate the evidence produced by Libront at trial under both the *McDonnell Douglas* formula and the standards pertaining to constructive discharge cases.

Libront performed personnel and safety functions at the Tonawanda facility. He was hired at age 52. He was the oldest, but not the highest paid employee in the department. Also in his department were Grant, age 50, and Hansen. As part of his duties, Libront had advised defendant regarding compliance with the ADEA. In the years 1978 through 1981 Libront received the lowest job performance rating in the department (exh. 571). As a result, his pay increases during those years did not correspond to the standard job grade increases.

Before the relevant period commencing in July 1982, it was determined by defendant that a new position should be created for someone to attend to labor relations matters. At that time, Grant had been performing these duties. Grant instructed Libront to place an advertisement for a personnel manager. Libront admitted that he had little experience in labor relations and had never participated in an employment arbitration proceeding. Libront himself selected an applicant, Chrzanowski, for recommendation to Grant. This recommendation was based upon Chrzanowski's considerable experience in the field of labor relations (see exh. 726). Grant hired Chrzanowski, and transferred some of his labor relations responsibilities to him. In addition, Chrzanowski assumed some of Libront's personnel duties. Nonetheless, Chrzanowski was not hired as a member of Grant's staff; he reported directly to the Tonawanda Plant Manager. Grant asked Libront to compose a Position Description outlining functions that Libront could perform in the department. Libront submitted his Position Description on April 26, 1982 (exh. 658).

Libront was not terminated at that time, although some of his job responsibilities were transferred to Chrzanowski. Libront testified that he had been treated fairly by defendant up to that time, and he had no complaint of age discrimination stemming from the hiring of Chrzanowski. Despite the hiring of Chrzanowski, Grant manifested a desire to retain Libront. He worked with Libront to create a new position for him, although the company was dramatically cutting back its workforce. For instance, Grant wrote to Libront on June 14, 1982:

> At this point we were faced with a choice of what to do with you, including the option of laying you off or finding other work for you might be qualified to perform. In deference to your years of service we are attempting the latter course.
>
> The only possibility that I see is to try you out as a direct report on my staff at the corporate level performing certain administrative personnel duties as can be transferred and developed. This may or may not work out but we will give it a

try.... Frankly, I have serious doubt that you possess the experience or communications skills to perform this function. In the meantime, however, you and I must spend some time exploring what assistance you can be in helping the Corporate Personnel Department perform its tasks.

(exh. 659). At trial, Libront stated twice that exhibit 659 is a fair summary of what Grant had told him at a meeting on June 11, 1982 to discuss his position, and that it was a fair "framework." Thus, only a few weeks before Libront's termination, defendant was attempting to find a niche within the department for Libront, although it expressed to him that problems were foreseeable.

Nevertheless, Grant received Ladds' memorandum of June 15, 1982 requiring all departmental supervisors to submit the names of employees who were the poorest performers, or were the most dispensable in their departments. Libront was rated the poorest performer and most dispensable in the department (exh. 571). Therefore, Grant recommended him for layoff. He testified that he needed Hansen in the department because of Hansen's experience in pension and employee matters. Furthermore, he could do Libront's duties himself.

What happened next is the subject of some dispute. Grant testified that he told Libront on July 8, 1982 that Libront would be laid off, but that Libront could consider accepting an early retirement package because he was otherwise eligible for it. This is confirmed by exhibit 682, Grant's summary of his July 8, 1993 meeting with Libront. Libront admitted in deposition testimony that this is what he was told. Libront testified at trial that he was told that if he did not accept early retirement he would be laid off, effective July 31 or August 1, 1982. However, at one point Libront was asked on cross-examination, "Do you now recall by memory you were given this choice by July 8?" Libront answered, "I really am not so sure. I'm trying to, but it's been so long." Libront accepted defendant's early retirement offer on July 30, 1982, and put the notation "without prejudice" on the signature page (exh. 572).

Whether Libront was told that he was being laid off and could choose early retirement instead, or was told that he could choose early retirement or be laid off as of July 31 or August 1, 1982 is a question of mere semantics, when viewed against the backdrop of all the evidence that was presented in support of Libront's case. Because every reasonable inference must be given to Libront pursuant to Fed.R.Civ.P. 50(a), this Court will assume that the second version of the conversation is correct. However, even when Libront is afforded that inference, he has failed to establish a prima facie case for age discrimination. Whether these facts are considered under the *McDonnell Douglas* formula, or under the principles that apply to constructive discharge cases, Libront's claim must fail because he has failed to raise an inference that he was terminated *because of his age.*

First of all, Libront was not replaced. Although Chrzanowski assumed some of his duties, the position was clearly a new position, created before Grant learned that there would be layoffs. Chrzanowski was not hired into the department or the Amherst headquarters. Instead, he worked in Tonawanda and reported directly to the Plant Manager there. Libront was not replaced after his retirement, and only Grant and Hansen remained. Grant assumed Libront's duties, and there is no evidence he was overburdened by them. There were no employees transferred into the department. Cf. *Montana,* 869 F.2d 100.

Nor do the other attendant circumstances give rise to an inference of age discrimination. Although Libront was the oldest of the three employees in the department, the only other non-supervisory employee was Hansen. Libront was not the highest paid. He did not share the qualifications of Hansen. He was the lowest rated employee in the department, and received pay raises that were less than normal. He testified that he was always treated fairly by the defendant, and that he had no "beef" of age discrimination prior to his retirement. See also, exhibit 48. There is simply no evidence sufficient to raise an inference that he was coerced into retirement because of his age. In fact,

shortly before his retirement defendant accommodated him with a new job position, allegedly "in deference to [his] years of service" (exh. 659). Libront has no proof of age discrimination except that he was 64 years old.

Even if Libront has established a prima facie case of age discrimination, he has nevertheless failed by this evidence to raise an inference that "a discriminatory reason more likely than not motivated the employer, or ... that the employer's proffered explanation is unworthy of belief." *Tyler,* 958 F.2d at 1181 (citations omitted). Therefore, Libront has failed to proffer sufficient evidence to meet his burden of proof under *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817.

Finally, Libront has not raised an inference of constructive discharge. Libront has alleged constructive discharge by relying on the assertion that he was told if he did not accept early retirement he would be terminated as of July 31 or August 1, 1982. First, it should be noted that employee benefit plans such as voluntary early retirement packages are presumed to be lawful under the version of the ADEA applicable to this case. A plaintiff may meet his burden of proof of showing that such a plan was unlawful by showing that his acceptance of the plan was involuntary or coerced. This is consistent with the relevant portion of the ADEA providing that no employee benefit plan may "require or permit the involuntary retirement of any individual ... *because of the age of such individual.*" 29 U.S.C. § 623(f)(2) (1985) (emphasis added).

In *Karlen v. City Colleges of Chicago,* 837 F.2d 314, 317 (7th Cir.), *cert. denied,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988), the court held that "a worker who elects early retirement cannot turn around and sue his employer unless he can show that he was forced to take early retirement by an explicit or implicit threat to fire (or otherwise punish) him *because of his age* if he did not." (emphasis added), *citing Henn,* 819 F.2d 824. This principle directly refutes the argument raised by plaintiffs' counsel during oral argument that the choice presented to Libront was discriminatory if he faced termination for *any reason,* not just a discriminatory

reason. See also *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463 (10th Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990), holding:

> An employee who claims that an offer of early retirement constitutes age discrimination by constructive discharge can meet this burden by demonstrating that the offer 'sufficiently alters the status quo that each choice facing the employee makes him worse off' and that if he refuses the offer and decides to stay, his employer will treat him less favorably than other employees *because of his age.*

*Id.* at 467 (emphasis added) (quoting *Bodnar*, 843 F.2d at 193).

In *Bodnar v. Synpol*, 843 F.2d 190 (5th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), the Fifth Circuit addressed a situation where early retirement offers were made against the backdrop of layoffs. The plaintiffs alleged that they had been constructively discharged by the corporation. They claimed that they had been told they would not receive any benefits if they refused the plan and were later terminated by layoff. They were explicitly told that layoffs would follow. Requests for additional time to consider the offer beyond the fifteen day period were denied. *Id.* at 192.

The Fifth Circuit upheld an award of summary judgment for the defendant. Most importantly, the court explained, "Of course, no individual employee or employee group may claim constructive discharge where all employees are subject to the same working conditions." *Id.* at 193 (citing *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982)). Despite the fact that the employees were told of impending layoffs, the court held:

> ... the risk that their jobs might be eliminated because of economic pressure on the company [is] insufficient to suggest age discrimination.... Appellants' risk, if they stayed on, would be shared by all remaining employees of Synpol. Compare *Vaughn v. Pool Offshore, supra.* It is thus fair here, as in *Henn*, to say that the [early retirement plan] afforded Appellants a

means to mitigate that risk which was not available to other employees.

*Id.* at 194.

Indeed, the situation in Libront's case is different in that he was explicitly told that he had a choice between layoff and retirement. Nonetheless, this difference does not create an inference of discrimination. The uncontradicted evidence shows that Libront was chosen for layoff *before* he was presented with the plan. Under either version of the way his layoff was communicated to him, Libront was simply being given a choice between layoff and retirement. Thus the retirement offer made him better off than the alternative rather than worse off. See *Wingfield v. United Technologies Corp.*, 678 F.Supp. 973, 982 (D.Conn.1988) ("There is no evidence that the employees who were given an explanation of a choice between retirement and demotion were discriminated against because of their age, and the mere fact that the employees were offered a difficult choice is not evidence" of discrimination).

Even if Libront believed that he was being threatened with retaliation if he refused the plan, he still failed to prove that this would amount to age discrimination. In order to prevail on his claim that his retirement was involuntary, he had to prove that he would have been laid off *because of his age.* As discussed above, the circumstances surrounding Libront's retirement do not raise an inference of age discrimination. Therefore, Libront has entirely failed to show that any employment decisions made by defendant were motivated by his age, and judgment as a matter of law will be awarded to defendant.

*Plaintiff Vivian Nowark*

 Nowark was a clerk/typist in the warehouse department at the Tonawanda facility. She was hired at age 45, and was therefore already a member of the protected age group. She was the oldest employee in her department, but was not the highest paid (exh. 711). She was laid off in April 1983 at age 61, upon the joint recommendation of Pratt and Eising, for the reason that her job was largely superfluous. She was not replaced, but believes that her duties were absorbed by Wilson, the 38 year-old? assistant foreman. Two of the three employees

laid off in her division were under the age of 25 (exh. 711).

Plaintiffs' counsel argued that an inference of discrimination can be drawn from the fact that defendant calculated the cost savings that would result from different methods of streamlining the corporation. For example, counsel argued that exhibit 89 shows a "general scheme" of terminating employees. Counsel also referenced exhibit 90, the "Ladds Memo", and exhibit 96, a list of employees who were eligible for early retirement. Nonetheless, this Court has already indicated that none of this evidence raises an inference that defendant engaged in a general scheme to rid the company of older workers. Likewise, plaintiff Nowark cannot rely on these documents to raise an inference of discrimination. Nor does exhibit 105 raise such an inference simply because of the notation that Nowark was recommended for layoff.

Even when every reasonable inference is afforded to Nowark, this Court concludes that she has not raised an inference that her layoff "occurred under circumstances giving rise to an inference of age discrimination." *Montana*, 869 F.2d at 104. Rather, plaintiff has utterly failed to show any reason at all for her layoff. This is not sufficient to prove a violation of the ADEA. Unlike *Montana*, there is no evidence that her duties were not easily absorbed by the employees who remained.

Finally, Nowark was not one of the highest paid employees, which distinguishes her case from *Metz v. Transit Mix, Inc.*, 828 F.2d 1202 (7th Cir.1987), holding that it may be impermissible under the ADEA to terminate highly paid older workers and replace them with lower paid younger workers. Even if plaintiff raised such an inference, she has not adduced sufficient evidence to infer that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). Therefore, Nowark has failed to raise an inference that age was a motivating factor in the decision to lay her off, and judgment as a matter of law will be awarded to defendant on her claim.

*Plaintiff Lois Quesnell*

██ Quesnell was a mailroom supervisor in the Amherst facility. She was hired at age 24. At the time of her layoff in July 1982, she was age 55 and was the oldest employee in the department, except for her supervisor, Deuchler. Deuchler told her that her layoff was due to economic difficulties. It is critical to note that the assistant supervisor in her department was plaintiff Cornwell. Cornwell is the one who recommended Quesnell for layoff based upon her job performance and functions. Cornwell testified that he was told to make recommendations for layoff in a way that would minimize disruption to the department. He stated that "her loss would be least disruptive." Cornwell prepared a performance review for Quesnell (exh. 591). Cornwell rated her quite favorably in many categories. Nonetheless, Cornwell rated her "fair" for accuracy on the job, and stated that she was "still very sloppy and beginning to cause problems. . . ." Cornwell rated her "satisfactory" for versatility, but noted that her "sloppiness and inability to finish a task once started causes problems." Finally, Cornwell commented, "Lois tries very hard, if desire were all that mattered she could do anything. As a mailroom supervisor she is most helpful however the mailroom is all she is able to handle." Cornwell specifically testified that age was not a factor in his selection of Quesnell for layoff. Quesnell's duties were absorbed by the two other employees in the mailroom, one of whose duties required driving. Quesnell did not drive.

The absorption of Quesnell's duties by the other employees in the mailroom is not sufficient evidence to establish plaintiff's prima facie case. Unlike the plaintiff in *Montana*, her supervisory duties were eliminated, not simply consolidated with another office or department. Furthermore, there is no evidence that her duties were not easily absorbed by the remaining employees.

However, even if the evidence were sufficient to establish a prima facie case, Quesnell has utterly failed to introduce sufficient evidence to infer that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explana-

tion is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). The uncontradicted testimony of Cornwell, her fellow age discrimination plaintiff, completely refutes any allegation of pretext and precludes any inference that the decision to lay Quesnell off was motivated by her age. Therefore, judgment as a matter of law will be awarded to defendant on her claim.

*Plaintiff Chester Suits*

■ Suits was hired as a janitor at the Damascus facility at age 26. He later became a stockroom foreman, and in January 1983 he was transferred to the position of payroll clerk. He was not the oldest employee in the department. He introduced no evidence comparing his pay to other employees. At age 42, he replaced payroll clerk Sue Baker, who was age 46. He was laid off from his position as payroll clerk at age 42 in April 1983. Employees under the age of 40 were also laid off (exh. 714). He was told that he was being laid off due to "the economy, business conditions, products, competition and etc." (exh. 115). He was recommended for layoff because he had "serious problems with paperwork" and was "[n]ot qualified to perform other jobs available" (exh. 107–A). His duties were assumed by Chris Galliher and then Brenda Dyson, a half-time worker who was transferred into the department and did not have problems with paperwork.

Suits has not established a prima facie case simply by showing that Dyson was transferred into the department on a half-time basis. Unlike *Montana*, his layoff left no gaping hole in the department. Furthermore, the population of the department did not increase. However, assuming that he did establish a prima facie case, he has nonetheless failed to adduce sufficient evidence to support a reasonable inference that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). He adduced no evidence calling the economic conditions or his job evaluations into question. Suits alleges that defendant orchestrated a scheme to transfer him into a job he could not adequately perform, and

then terminate him for poor performance. Nonetheless, he failed to offer any evidentiary support for such a claim. Similarly, he offered no proof that there was a plan to eliminate older workers progressively by transferring them to the job of payroll clerk. Finally, evidence was introduced that directly contradicted his claim of pretext. Portions of his pre-trial deposition were introduced, in which Suits stated that he did not believe that his layoff was the result of age discrimination (Court exh. 12, p. 91, I. 22). Therefore, Suits has failed to raise an inference that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

*Plaintiff Cecil Taylor, Jr.*

■ Taylor was a production scheduler at the Damascus facility. He was hired at the age of 30. Prior to becoming a scheduler, he was a machine shop foreman. He was transferred due to a back injury that rendered him physically unable to perform any longer as a foreman (exh. 610).

Taylor was laid of at age 47 in April 1983. He was told that he was being laid off due to economic difficulties resulting in a dramatically shrinking department. Indeed, a dramatic reduction of personnel occurred in his department. Taylor had been one of two schedulers, and the other scheduler, who was younger than Taylor, had previously been laid off in July 1982 (exh. 736). Taylor testified that he was not aware of anyone being hired to replace him, until recently. His job was eliminated, and defendant did not consider him qualified to perform other available jobs (exh. 107–A).

In light of these factors, Taylor has utterly failed to show that his "discharge occurred under circumstances giving rise to an inference of age discrimination." *Montana*, 869 F.2d at 104. Furthermore, he has failed to raise an inference that "a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citations omitted). In fact, he admitted that he witnessed a declining work load in his department. Furthermore, he was not replaced until, possibly, quite

recently. Therefore, Taylor has failed to show that age was a motivating factor in the decision to lay him off, and judgment as a matter of law will be awarded to defendant on his claim.

### CONCLUSION

Plaintiffs rested their case and defendant brought the present motions after nearly two months of trial. Plaintiffs made many allegations against defendant. In this complex case, they produced many witnesses and introduced a considerable amount of documentary evidence. Some evidence upon which they heavily relied was not admitted because it was simply not relevant to their case, including their proposed statistical evidence.

At times throughout the trial, plaintiffs' arguments and evidence were presented in a fashion that was not conducive to analysis under the various individual and collective theories of age discrimination that they were embracing, e.g., disparate treatment, disparate impact, pattern or practice, etc., or that demonstrated precisely what inferences they were asking the jury reasonably to draw from the evidence. Of course, plaintiffs could have embraced each of their theories simultaneously if the evidence supported them; here, however, the evidence did not.

Nevertheless, this Court was not prevented from undertaking a thorough review of the testimonial and documentary evidence presented during plaintiff's case. This Court examined all the evidence and considered it in relation to plaintiffs' various theories of the case, mindful at all times that every reasonable inference must be afforded to plaintiffs. This Court did not weigh the evidence, nor did it determine the credibility of witnesses.

After reviewing all the evidence, this Court concludes that the evidence does not support plaintiff's individual or collective allegations. Plaintiffs have failed to raise an inference that defendant's cost saving measures had a disparate impact on a class of workers protected by the ADEA. Nor have plaintiffs raised an inference that defendant engaged in a pattern or practice of intentional age discrimination, or that age was a motivating factor in any of their layoffs.

Therefore, for the reasons discussed above, the testimony of Dr. Reiber is not relevant to plaintiffs' disparate impact theory of age discrimination, and is therefore inadmissible, pursuant to Fed.R.Evid. 402. Furthermore, judgment as a matter of law is awarded to the defendant on plaintiff's disparate impact and pattern or practice claims, and on the individual claims of each plaintiff.

### ORDER

IT HEREBY IS ORDERED that defendant's motion to preclude the testimony of Dr. Reiber is GRANTED, pursuant to Fed. R.Evid. 402.

FURTHER, that defendant's motion for judgment as a matter of law on plaintiff's disparate impact claim is GRANTED, pursuant to Fed.R.Civ.P. 50(a).

FURTHER, that defendant's motion for judgment as a matter of law on the individual claims of plaintiffs Riggie, Andrews, Kennedy, Salefske, and Wik is GRANTED, pursuant to Fed.R.Civ.P. 50(a).

FURTHER, that defendant's motion for judgment as a matter of law on plaintiffs' pattern or practice claim is GRANTED, pursuant to Fed.R.Civ.P. 50(a).

FURTHER, that defendant's motion for judgment as a matter of law on the claims of the twenty-three remaining plaintiffs: Barnes, Carere, Clark, Cornwell, Dorko, Ferris, Grimes, Habicht, Hodkin, Koval, Kreutzer, Larkey, Libront, Long, Luke, Mikos, Nowark, Quesnell, Rook, Suits, Taylor, Thomas, and Widener is GRANTED, pursuant to Fed.R.Civ.P. 50(a).

FURTHER, that the Clerk of the Court is directed to enter final judgment in favor of defendant and against plaintiffs.

SO ORDERED.