Anderson PARKER, Plaintiff,

v.

CHRYSLER CORPORATION, Defendant.

No. 94 CV 3939.

United States District Court,
S.D. New York.

June 11, 1996.

Steve Bergstein, Law Offices of Michael H. Sussman, Goshen, NY, for Plaintiff.

Laurence B. Liebowitz, Cooper, Liebowitz, Royster & Wright, Elmsford, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Anderson Parker brings this diversity action under the New York Human Rights Law (Executive Law § 290 et seq.) against his former employer, Chrysler Corporation ("Chrysler"), for discrimination. Presently before the Court is Chrysler's motion, pursuant to Fed.R.Civ.P. 56 for summary judgment.

## BACKGROUND

Parker, a black male, worked for Chrysler at its facility in Tappan, New York from 1972 through 1991. The crux of Parker's complaint is that Chrysler forced him to retire on account of his race. Critical to this summary judgment motion, therefore, are the circumstances surrounding Parker's resignation.

In April, 1991, Parker received a brochure for Chrysler's newly implemented Special Early Retirement Voluntary Termination Incentive Program ("VTIP"). The package was accompanied by a cover letter signed by Chrysler's president, Lee Iacocca, which explained that, as a result of "slim profits," Chrysler needed to reduce its workforce by 3,000. The letter also explained that choosing the program was completely voluntary. The VTIP package included $62,000, a Chrysler vehicle, six months of continued life and health insurance coverage, and savings plan benefits. The brochure also offered information sessions and outplacement counseling in connection with the VTIP.

According to Parker, as soon as he received the VTIP brochure, his supervisors, Skip Dahlman and Jim Garden, repeatedly asked him if he had decided whether he would accept the offer. Garden told Parker that if he did not accept the VTIP, he could be placed in a 30–60–90 day probation program with the possibility of termination if his job performance was considered unsatisfactory. During this time, three other supervisors relinquished their supervisory positions and resumed their former positions on the plant floor. When Parker asked what would happen if he resigned as a supervisor and returned to the floor, Dahlman responded that he would be one of the first to be laid off, although in reality his union contract included a no lay off clause. Dahlman also told Parker that as long as he was the warehouse manager, Parker would never work in the warehouse again. Apparently, Dahlman then threatened Parker with tasks that he was overqualified to do.

During this time period, Parker spoke with a number of individuals about the VTIP. He used the outplacement services to seek a new job. Moreover, Parker spoke with management about the plan. He spoke with Bill Bloomberg, a manager from Detroit, Bob Jasper, the Tappan plant manager, and Dahlman. He also spoke with his brother (another Chrysler employee from the Tappan facility) and his fiancee. On April 29, 21 days after receiving the VTIP brochure, Parker signed it. On April 30, he resigned. Out of eight supervisors at the Tappan facility in 1991, Parker was the only black supervisor, although during recent years, the facility had numerous black supervisors. One other supervisor, Joe Debartola signed the VTIP. On April 29, 1994, Parker filed a complaint in Rockland County Supreme Court seeking damages against Chrysler for discrimination based on race in violation of New York Executive Law § 296. Chrysler removed the action to this Court pursuant to 28 U.S.C. § 1446. This motion followed.

## DISCUSSION

### A. ERISA

At the outset, we address defendant's contention that because Parker left Chrysler with a VTIP, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 governs this action. Chrysler argues that § 514(a) of ERISA, which provides in part that ERISA "shall supersede any and all state laws insofar as they may relate to an employee benefit

plan" governed by ERISA, 29 U.S.C. 1144(a), applies to Parkers's signing of the VTIP. Not all state law claims brought in an action involving an employee benefit "relate to" that plan within the meaning of 514(a); rather such claims generally "relate to" a benefit plan when they arise out of some action taken in the execution or administration of the plan. See *Owens v. Metropolitan Life Ins.*, 865 F.Supp. 100, 102–03 (N.D.N.Y. 1994); see also *McNamee v. Bethlehem Steel Corp.*, 692 F.Supp. 1477, 1478 (plaintiff's claims were not covered by ERISA because he did not seek benefits under the plan, but rather damages for defendant's failure to permit vesting of the plan as promised). Chrysler relies primarily on *Barbagallo v. General Motors Corporation*, 818 F.Supp. 572 (S.D.N.Y.1993). In that case, plaintiff attacked the structure of a plan as discriminatory because of age. Here, however, Parker does not challenge the plan's structure, nor does he dispute the execution or administration of the plan but rather challenges the events which culminated in his decision to accept the plan. Accordingly, we reject defendant's argument and we analyze this matter as we analyze other discrimination claims.

## B. Standard For Summary Judgment

 Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); see also *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party must meet a burden of coming forward with "specific facts, showing that there is a genuine issue of fact for trial," Fed.R.Civ.P. 56(e) by a showing sufficient to establish the existence of [every] element essential to the party's case, and on, which

the party will bear the burden of proof at trial.

 In deciding whether a genuine issue of material fact exists, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). The Court is to inquire whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby Inc*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable conclusory, speculative or not significantly probative. *Knight v. United States Fire Ins.*, 804 F.2d 9, 12–15 (1986), *cert denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

## C. Plaintiff's Prima Facie Case

 The standards relating to burden of proof and the order of proof in employment discrimination cases brought under the Human Rights Law are the same as those established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 for cases brought pursuant to Title VII of the Civil Rights Act of 1964. See *Miller Brewing Co. v. State Division of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985).

 The three step process laid out in those cases requires that, first, the plaintiff establish a prima facie case of the discrimination. If the plaintiff sustains this burden, the defendant must offer rebuttal evidence articulating a legitimate independent nondiscriminatory reason for its actions. Once defendant does so, in order to prevail, plaintiff must prove, by a preponderance of the evidence, that the defendant's stated reasons are only a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. The ultimate burden of persuading the finder of fact that an employer unlawfully discriminated against the plaintiff, remains at all times with plaintiff. *St. Mary's Honor Cen-*

*ter v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993).

▮ To satisfy the first step in this three step process and make out a prima facie case, plaintiff must establish that he is in a protected class, that he was qualified for the position in question, that he was discharged, and that the discharge occurred under circumstances giving rise to an inference of racial discrimination. See *Burdine* at 253–54, n. 6, 101 S.Ct. at 1093–94 n. 6. First, the parties do not dispute that Parker is a member of a protected group. Second, with respect to Parker's qualifications, however, the facts are in dispute. Although Parker's proof as to this factor is thin, we find that he has met his burden. The record before us indicates that in 1984, after 8 years at Chrysler, Parker was promoted to his supervisor position and that in 1985, he passed his one year probationary period.

▮ As for the third step, in evaluating employment discrimination claims, we apply the concept of constructive discharge. *Lopez v. S.B. Thomas,* 831 F.2d 1184, 1188 (2d Cir.1987) (citations omitted).[1] When a constructive discharge is found, an employee's resignation is treated—for the purposes of establishing a prima facie case of employment discrimination—as if the employer had actually discharged the employee. *Lopez,* 831 F.2d at 1188 (citations omitted).

▮ "A constructive discharge occurs when the employer, rather than acting directly, makes working conditions so intolerable that the employee is forced into involuntary resignation." *Lopez,* 831 F.2d at 1188. To find that an employee's resignation amounted to a constructive discharge, "the trier of fact must be satisfied that . . . the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez,* 831 F.2d at 1188.

Chrysler argues that Parker's termination was not a constructive discharge but the product of his own choice since he voluntarily signed the VTIP. Chrysler argues that Parker's current belief that he was forced into retirement or resignation is insufficient as a matter of law to establish a constructive discharge. Parker signed the following statement:

I hereby accept this offer of Voluntary Incentive Pension. The effective date of separation will be April 30, 1991. I acknowledge that I have had reasonable time to consider this offer, to discuss it with my attorney and/or financial advisor, and that my acceptance of this offer is completely voluntary on my part and was in no way forced upon me by Chrysler. I further understand that this election is in lieu of any other choice of retirement, including Employee Option or Normal retirement, to which I might might otherwise be eligible.

At the oral argument of this motion, Parker's counsel conceded that he would not be entitled to prevail on his constructive discharge claim unless he demonstrated that his execution of the VTIP was the result of duress or coercion. Parker's deposition was taken on October 20, 1994, a considerable amount of time after his resignation. There, Parker testified that he knew that the plan was voluntary. He also testified that he had the information concerning the VTIP for three weeks before he signed it. See *Henn v. National Geographic Society,* 819 F.2d 824, 830 (7th Cir.1987), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). During that time, Chrysler also told him that he could consult with an attorney and that he could speak with other Chrysler employees about the package. Parker did not speak

---

1. In *Lopez,* plaintiff, an Hispanic male, had been employed by the defendant for twelve years and had received satisfactory performance evaluations. He was then transferred to a new location under a new supervisor. After a month, a new supervisor was appointed. From this point, "Lopez's relationship with his employer deteriorated." *Lopez,* 831 F.2d at 1186. The new supervisor harassed Lopez, criticized his work and gave him unacceptable performance ratings. Lopez approached the Division Manager who suggested that Lopez resign. The supervisor eventually placed Lopez on a 90–day probation period and allegedly told Lopez that "he would be fired at the end of the period regardless of his performance." *Lopez,* 831 F.2d at 1186. The Second Circuit held that Lopez raised issues of fact as to whether he was constructively discharged based on his allegations that he would be fired "no matter what he did to improve his allegedly deficient performance." *Lopez,* 831 F.2d at 1188.

with an attorney, but he testified that he did speak with family members and other Chrysler employees before he signed the VTIP. See *Skluth v. United Merchants & Manufacturers*, 163 A.D.2d 104, 559 N.Y.S.2d 280 (App.Div. 1st Dept.1990) ("the absence of counsel is far less critical than the opportunity to consult counsel") (citing *Cirillo v. Arco Chemical*, 862 F.2d 448 (1988)); *Lancaster v. Buerkle Buick Honda*, 809 F.2d 539 (8th Cir.1987), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987).

■ Parker, however, argues that the opportunities to review the VTIP and discuss it with others were presented against a backdrop of intolerable working conditions, and that, in effect, he signed it under duress or coercion. Under New York law, a contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding his exercise of free will. *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626, 632 (2d Cir.1992) (quoting *Austin Instrument Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971)).

■ The Restatement (Second) of Contracts recognizes three types of duress: duress by physical compulsion, undue influence and duress by threat. Restatement (Second) of Contracts § 176 (1981). In this case, Parker does not allege physical threats or undue influence. Moreover, he fails to make a showing that he was threatened overtly. See *Joseph v. Chase Manhattan*, 751 F.Supp. 31 (E.D.N.Y.). We assume that during this period, Dahlman and Garden aggressively encouraged Parker to sign the VTIP. But the fact that they told him such things as they could not guarantee his future at Chrysler does not establish a threat sufficient to constitute duress. The fact that the choice offered is between inherently unpleasant alternatives—resignation or job insecurity—does not by itself establish that a resignation was induced by duress or coercion. See *Stone v. University of Maryland Medical System*, 855 F.2d 167, 173 (4th Cir.1988). See also *Henn v. National Geographic Society*, 819 F.2d at 830 ("an employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting"); *Libront v. Columbus McKinnon Corp*, 832 F.Supp. 597, 614–15 (W.D.N.Y.1993). Moreover, according to Parker himself, at the time he signed the VTIP, he knew that it was voluntary. See *Frederick Martin v. Bethlehem Steel*, 1988 WL 110459 (D.Md.1988) ("Plaintiff had the choice of either retiring [early] and receiving an additional five percent to his pension plan or maintaining his employment with current salary or benefits. Because he had this choice, Plaintiff's retirement was voluntary"). Notwithstanding Parker's contentions that his decision was a difficult one, these facts are simply not sufficient to raise a material issue as to the voluntariness of his acceptance of the VTIP. These facts—construed generously in Parker's favor—simply do not amount to duress or coercion, especially since he represented in writing and later swore under oath that his resignation was completely voluntary.

■ Since the evidence is insufficient to satisfy the third step, we do not reach the issue of an inference of discrimination.[2] Ac-

---

2. Plaintiff alleges that throughout his career at Chrysler he was treated differently than white supervisors. In his early years as a supervisor, he felt compelled to purchase tools necessary to perform his job while Chrysler provided those tools free of charge to his white colleagues. Parker also claims that unlike the relatives of his white peers, his nephew was not given the opportunity to pursue a full time position at Chrysler. Parker also recounts a time in 1986 when his boss, without legitimate justification told him that "he did not have it to be a supervisor" and asked him to resign. Parker also claims that during that year he was the only supervisor who was denied the opportunity to work overtime. Additionally, Parker alleges that he was permit-

ted fewer sick, personal, and bereavement days than his white peers. Finally, Parker claims that in 1990, his supervisor gave him an unfair review and left him nasty notes without justification. While these events fall outside the limitations period for the purposes of a disparate treatment claim, they may be considered as evidence of discriminatory atmosphere to the extent that they amount to intolerable working conditions. See *United Air Lines Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Malarkey v. Texaco*, 983 F.2d 1204, 1210–11 (2d Cir.1993).

Notwithstanding, plaintiff's assertions that he bases his constructive discharge theory on the

cordingly, this Court finds that the evidence presented is insufficient to establish a prima facie case of discrimination as to both of Parker's claims.

## CONCLUSION

For the reasons stated, Chrysler's motion for summary judgment is granted.

The clerk shall enter judgment.

**SO ORDERED.**

duress and coercive aspects of his resignation, we find that these incidents are not legally sufficient to sustain an inference that a reasonable person would have felt compelled to resign. See *Martin v. Citibank N.A.*, 762 F.2d 212, 221 (1985) (evidence that "plaintiff's supervisor loudly mentioned her having been polygraphed ... [and] had once given her the wrong combination to the night deposit box and that someone using his card had once interfered with her deposits, and that she had been required to process deposit records while serving customers ... [was insuffi-

cient] to sustain an inference that a reasonable person would have felt compelled to resign); *Less v. The Nestle Company*, 705 F.Supp. 110, 113–14 (W.D.N.Y.1988) (allegations plaintiff's job changed somewhat, his workload increased to unattainable proportions, that he was encouraged to retire by being offered a "deal" if he did not accept it at that time, and that he was bypassed for several promotions without being offered those opportunities did not indicate the presence of any intolerable conditions or undue compulsion).